# Exhibit G

2 of 2 DOCUMENTS

DIANE DENMARK, Plaintiff, v. Liberty LIFE ASSURANCE COMPANY OF BOSTON, THE GENRAD, INC. LONG TERM DISABILITY PLAN, THROUGH TERADYNE, INC. AS SUCCESSOR FIDUCIARY, Defendants.

CIVIL ACTION NO. 04-12261-DPW

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2005 U.S. Dist. LEXIS 27180

November 10, 2005, Decided

**COUNSEL:** [*1] For Diane Denmark, Plaintiff: Jonathan M. Feigenbaum, Phillips & Angley, Boston, MA.

For Liberty Life Assurance Company of Boston, The Genrad, Inc. Long Term Disability Plan, as successor fiduciary, Defendants: Andrew C. Pickett, Richard W. Paterniti, Jackson Lewis LLP, Boston, MA.

**JUDGES:** DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DOUGLAS P. WOODLOCK

**OPINION:**

MEMORANDUM AND ORDER

The Plaintiff Diane Denmark brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. § § 1001-1461* seeking review of the decision by the Defendant Liberty Life Assurance Company of Boston ("Liberty") to deny her, a participant in the Defendant Genrad, Inc. Group Disability Income Policy ("Disability Policy"), long term disability ("LTD") benefits. Specifically, the Plaintiff seeks to recover LTD benefits allegedly due to her pursuant to *29 U.S.C. § § 1132(a) (1) (B), (2) and (3)*. The Plaintiff and the Defendants have both moved for summary judgment pursuant to *Fed. R. Civ. P. 56*. In addition, the Plaintiff seeks to supplement the administrative record with documents discovered [*2] pursuant to my order of April 4, 2005.

**I. BACKGROUND**

**a. Facts**

The Plaintiff began working at GenRad, Inc. ("GenRad") on April 2, 1973 at age twenty-three. She had only completed formal schooling through the eighth grade. GenRad employed her as a Group Leader in Manufacturing Inspection. In this position, the Plaintiff was primarily responsible for overseeing "the inspection of GenRad components, modules, and finished systems to specifications and quality standard"; making "routine work assignments, monitoring job performance and ensuring an efficient work flow"; and providing "guidance, assistance and training to less senior inspection personnel." An internal GenRad document lists the physical demands of this position as follows: "Bending, squatting and body movement involved inspecting external and internal components of various products. Ability to utilize material handling equipment to move test equipment and position product. Occasional lifting of 25 pounds." The Plaintiff continued in this position through October 2, 2001. At that time, the Plaintiff's bi-weekly earnings were $ 1,844, excluding commissions and bonuses, and her monthly income, including commissions [*3] and bonuses, was $ 3,995.33.

The Plaintiff stopped attending work on October 3, 2001 (her date of disability) allegedly for health reasons. She had been suffering from fatigue and muscle pain, symptoms consistent with fibromyalgia syndrome, for a number of years. The Plaintiff's primary care physician, Dr. Gregory Malanoski, first diagnosed her with fibromyalgia in 1996. Fibromyalgia is a chronic disorder that can be alleviated, but not cured. There is no single treatment that is effective for everyone, but certain drug regimes are often used to alleviate the chronic pain and sleep disturbance. n1 The Plaintiff's symptoms had occurred periodically, but she claims that they worsened to the point where she could no longer work in October 2001.

n1 The Seventh Circuit recently described fibromyalgia as "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are pain all over,' fatigue, disturbed sleep, stiffness, and -- the only symptom that discriminates between it and other diseases of a rheumatic character -- multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. . . . Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [the claimant] is one of the minority." *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) citing *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996). See also *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 15, n. 4 (1st Cir. 2003) citing National Institutes of Health, *Questions and Answers About Fibromyalgia*, at http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm (December 1999).

[*4]

On the date of disability, the Plaintiff was covered under GenRad's Short Term Disability Benefits Plan and its Long Term Disability Benefits Plan. Liberty served as the disability claims administrator for the STD plan, providing an initial claims review and decision for STD claims by GenRad employees. Liberty also served as the insurer for the Long Term Disability Benefits Plan, which was administered through the Group Disability Income Policy, policy no. GF3-810-254021-01 (the "Disability Policy"). At some point in late 2001, Teradyne, Inc. ("Teradyne") acquired GenRad, but the Plaintiff's rights to disability benefits under the two plans remained the same. 1. Short-Term Disability Benefits -- The Plaintiff filed for short term disability ("STD") benefits shortly after October 3, 2001. Under the STD plan, "disability" or "disabled" meant that the claimant is "unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness."

To evaluate the Plaintiff's claim, Nurse Debra Kaye, a Liberty Disability Case Manager, reviewed the medical records provided by Dr. Malanoski n2 and Dr. Thomas Goodman n3, a [*5] rheumatologist to whom Dr. Malanoski referred the Plaintiff on October 4, 2001. From these records, Nurse Kaye noted that the information "does support [a diagnosis] of fibromyalgia," but that "there is no evidence that [the claimant] needed to cease occupational functioning" and that in the past she "was able to function in an occupational setting full time, working long hours" because her "occasional flares . . . have responded to physical therapy." Earlier one of the Liberty employees noted, however, that the Plaintiff has been "using vacation time when unable to [work] -- (some half days also) as condition is worsening over last few years." Nonetheless, Nurse Kaye repeatedly commented that it was unclear what had changed in her condition to support the restrictions/limitations justifying disability benefits. Based on this analysis, Nurse Kaye requested an independent medical review of the Plaintiff's medical records. In the medical file sent to the peer reviewer, Nurse Kaye also included medical records provided by Dr. Terrence Hack, a cardiologist whose report she thought showed that there were no serious cardiac arrhythmias or other cardiac symptoms that would support any [*6] new restrictions/limitations.

n2 On October 4, 2001, Dr. Malanoski diagnosed the Plaintiff with fibromyalgia and GERD (Gastroesophageal Reflux Disease). According to the Attending Physician Statement dated November 6, 2001, his diagnosis of fibromyalgia was based on the following "objective medical findings", as best as I can decipher them: diffuse muscle tenderness, weakness and fatigue. He opined that the Plaintiff's physical impairment was Class 5, meaning "severe limitation of functional capacity; incapable of minimum activity", and that the Plaintiff's treatment plan was a "rheumatology consult and physical therapy." In his medical notes on October 4, 2001, Dr. Malanoski indicated that the Plaintiff was "Doing poorly: much worse myalgia generally. . . . No work until further [follow-up]." He also listed the nine prescribed drugs she was taking for her multiple ailments.

n3 Dr. Goodman indicated that the Plaintiff had multiple trigger point sensitivities consistent with fibromyalgia and that "recently her symptoms of fatigue, exhaustion, myalgia and

insomnia had worsened. These symptoms appear to have been quite marked over the last year or so, such that she is unable to perform her usual work as a quality control group leader" as "this work requires her to be on her feet all day." Dr. Goodman opined that her medications "afford her some relief of her symptoms but she remains totally disabled in terms of her line of work. She is unable to perform this work as she is unable to be on her feet for the amount of time it takes to perform her job adequately. She is also disabled by exhaustion and myalgia which makes it difficult for her to stay at work for any appreciable amount of time. The prognosis for this condition . . . is poor to fair. My hope is that we can improve Diane's exhaustion and her pain with medication she is currently receiving." Dr. Goodman indicated that the Plaintiff's past medical history and present abnormal conditions also included anemia, atrial fibrillation, high cholesterol, angina, and Raynaud's Phenomenon. He also noted in October 2001 that the Plaintiff exercises on a "regular schedule." Nurse Kaye interpreted his note on November 6, 2001 as meaning that the Plaintiff's menopausal symptoms have exacerbated her fibromyalgia symptoms.

[*7]

Dr. Clay Miller, a physician specializing in Physical Medicine and Rehabilitation, reviewed the medical records in the Plaintiff's file and issued a Peer Review Analysis on December 5, 2001. In his report, Dr. Miller concluded that Dr. Goodman's October 2001 rheumatology exam documented a normal neurological and musculoskeletal physical exam, other than the 18 positive fibromyalgia tender points, and that "there are no documented objective physical exam findings that support a decrease or significant change in this patient's physical condition" around the date of disability. Furthermore, Dr. Miller found that the "treatment to date has been appropriate", although he "would recommend multidisciplinary chronic pain management with behavioral interventions."

Based on Dr. Miller's report and the medical records submitted by Dr. Malanoski, Dr. Goodman and Dr. Hack, Liberty concluded that the Plaintiff's claim for STD benefits should be denied. Liberty then sent a denial letter signed by Mary Ellen Smith, a Liberty Disability Case Manager, to the Plaintiff dated December 26, 2001 explaining that their review of the medical records available failed to demonstrate any restrictions or limitations [*8] that would preclude the plaintiff from performing the duties of her job at GenRad. Liberty also sent letters signed by Mary Ellen Smith to Dr. Goodman and Dr. Malanoski asking them to review Dr. Miller's peer review and reply with comments if they disagreed. Dr. Malanoski replied that he "strongly disagreed with the peer review decision not to provide disability benefits" because fibromyalgia is a "condition lacking abnormalities in blood testing or specific abnormalities in physical exam." (emphasis in original). Dr. Malanoski also indicated that Dr. Goodman "agrees with her degree of disability."

The Plaintiff exercised her right to appeal the denial in a request for review dated January 3, 2002. On January 17, 2002, Liberty informed the Plaintiff that her employer reviewed all appeals itself and that her file and appeal documents had been forwarded on to her employer, now called Teradyne. Thereafter, Teradyne decided that the Plaintiff should undergo an "Independent Medical Examination" and Dr. Goodman referred her to Dr. Peter Schur.

In Dr. Schur's letter summarizing his findings, he stated that most of the Plaintiff's symptoms suggest classical fibromyalgia, although he [*9] wondered whether other tests might show she actually has polymyalgia rheumatica or rheumatoid arthritis. n4 He also questioned prior findings related to cardiac disease and whether she needs to take so many medications, some of which have been associated with fatigue. He found that the Plaintiff "clearly has a sleep disorder" and that she is "severely deconditioned and clearly needs to get some exercise but probably won't until she sleeps." He concluded that "at least for the time being, she is clearly disabled not only from work, but being able to take care of her household . . . For now, until [modifications of her regime improve her situation and stamina] n5, which may take months, she is clearly disabled." Teradyne subsequently determined that it would pay STD benefits to the Plaintiff through April 3, 2002 based on this Independent Medical Exam.

   n4 Dr. Schur found that the Plaintiff's "shoulder and pelvic girdle problems plus her history of an elevated sedimentation rate would make one suspect PMR [polymyalgia rheumatica], but I think most of this, in fact, as suggested by others, is classical fibromyalgia. I find a CRP [C-reactive protein measurement] much better for evaluating inflammation than a sedimentation rate, but given her morning stiffness, makes one suspect either PMR or, in fact, RA [rheumatoid arthritis], and wonder what a rheumatoid factor, CRP, and x-rays of the hands might show."

Case 1:03-cv-12389-GAO   Document 28-36   Filed 02/08/2006   Page 5 of 13

Page 5
2005 U.S. Dist. LEXIS 27180, *

[*10]

> n5 Specifically, Dr. Schur indicated that he suggested "some modifications of her regime that hopefully will improve matters, so that she can get her stamina back and be able to go back to work. However, for now, until that is accomplished, which may take months, she is clearly disabled." (emphasis supplied)

2. Long-Term Disability Benefits -- The Plaintiff filed for LTD benefits on or about June 5, 2002. Section 2 of the Policy defines "Disability" or "Disabled" as follows:

> 1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:
>
> > i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury of Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
> >
> > ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

Section 2 also defines "Any Occupation" as "any [*11] occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity" and "Own Occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy Liberty will consider the Covered Person's occupation as it is normally performed in the national economy."

"Sickness" is defined as "illness, disease, pregnancy or complications of pregnancy."

Along with her application for benefits, the Plaintiff, through her attorney, submitted Dr. Goodman's December 11, 2001 report and Dr. Schur's April 12, 2002 letter. The Plaintiff also completed claims paperwork, including an Activities Questionnaire and a Training-Education-Experience Form, and provided the medical records evaluated for her STD claim as requested by Liberty. Liberty also requested and received a basic occupational description of the Plaintiff's position as described by the Department of Labor Dictionary of Occupational Titles (DOT). That document, which the sender noted lacked input from a vocational professional, set out the physical requirements for [*12] a Group Leader, Printed Circuit Board Quality Control (Code 726.361-018) as follows: "Strength: Light -- Lifting, Carrying, Pushing, Pulling 20 Lbs. occasionally, frequently up to 10 Lbs., or negligible amount constantly. Can include walking and or standing frequently even though weight is negligible. Can include pushing and or pulling of arm and or leg controls."

To evaluate the Plaintiff's LTD benefits claim, Nurse Kaye again reviewed the Plaintiff's medical file focusing on the information added since her initial review. After reviewing Dr. Goodman's December 11, 2001 report, Dr. Malanoski's January 14, 2001 letter and Dr. Schur's April 12, 2002 letter, Nurse Kaye concluded that her additional "review does not [yield] new medical information to alter previous findings that [there was no] significant change in [claimant]'s condition" around the date of disability "to substantiate [restrictions/limitations] during the elimination period." After reviewing GenRad's job description of a "Group Leader -- Manufacturing Inspection" and the DOT description for Group Leader, Printed Circuit Board Quality Control, Nurse Kaye found that Dr. Goodman's assertion that the Plaintiff is [*13] "unable to stand for long duration at work is not supported by the physical job demands of her job." Nurse Kaye opined that the Plaintiff "may be self-limiting her work or social activities". She also questioned the usefulness of Dr. Schur's opinion in assessing the Plaintiff's condition for the past six months because his report only provides information for the particular date of the independent medical exam. Based on this review, Liberty sent the Plaintiff a LTD benefits denial letter on August 20, 2002 signed by Elizabeth Kiernan, a Senior Disability Case Manager.

The Plaintiff appealed the LTD benefits denial in a letter dated September 24, 2002 and subsequently forwarded a report by Dr. Milton Taylor dated July 24, 2002. In that report, Dr. Taylor concluded "it is likely

that [the Plaintiff] does, in fact, have some difficulty with concentration when she becomes overly fatigued" and that the Plaintiff "presents in an honest and straightforward manner and I suspect that she has some significant physical limitations, as noted by Dr. Schur, M.D. I do not believe that her depression, in and of itself, is of sufficient severity to prevent her from gainful employment. Therefore, [*14] the all important factor in her disability claim would have to be medical in nature."

As part of Liberty's review of the Plaintiff's appeal, Liberty requested a labor market survey and vocational review to determine the actual physical requirements of the Plaintiff's occupation as it is performed in the local and national economy. The vocational consultant was given GenRad's job description for Group Leader -- Manufacturing Inspection, the DOT description for Group Leader, Printed Circuit Board Quality Control, and the Plaintiff's Training-Education-Experience Form. The consultant concluded that "the physical demands would be considered sedentary to light work with occasional standing, walking and bending. The opportunity to intermittently change positions from sitting to standing and walking is typically provided during the course of the workday."

Liberty also arranged for a surveillance investigation to determine the Plaintiff's activity level. Miles Investigations, Inc. conducted a surveillance on October 24 and November 2, 4, and 5, 2002. On October 24th, the Plaintiff was observed doing errands for just over three hours. The investigator reported that she was "walking and moving [*15] in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties." On the other days, the investigator did not observe any activity out of her house except one quick trip to a drug store, although the Plaintiff did not appear to be home on the morning of the 2nd.

Lastly, Liberty sent the vocational consultant's report, the labor market survey, the surveillance report, and all of the available medical records to the Network Medical Review -- Elite Physicians ("NMR") for a final medical review. Dr. John Bomalaski did the review and wrote a report on December 4, 2002. He found that the "clinical medical evidence does not clearly support severe impairment because . . . the diagnosis of fibromyalgia remains in question." He also concluded that the Plaintiff "is capable of working full time in a primarily sedentary position within the limitations and restrictions noted on the Functional Capacities Form." The physical limitations to which he referred were that, in his opinion, the Plaintiff would occasionally (up to one third of an eight hour day) have difficulty sitting, standing, walking, driving, pushing, pulling, reaching, grasping, [*16] doing repetitive wrist, elbow, shoulder or ankle motions, and lifting up to 20 lbs. n6 He also found that she would seldom have difficulty squatting, bending, keeling and climbing stairs. Dr. Bomalaski recommended that additional laboratory studies be performed to rule out other diagnoses; that other treatments and medication be tried to see if any are more effective; and that the Plaintiff's depression should be treated because it might improve her overall discomfort.

> n6 Dr. Bomalaski did not fill out the form indicating one way or the other whether the Plaintiff would be restricted if she had to lift more than 20 lbs.

Based on this information, Liberty declined to alter its original determination and sent a letter dated December 10, 2002 and signed by Michelle Scott, a Liberty Appeal Review Consultant, which concluded that the "medical evidence lacks support of a severity of impairment that would preclude [the Plaintiff] from performing her own occupational job duties as customarily performed[.]"

3. [*17] Social Security Decision -- On January 31, 2004, Administrative Law Judge Carter (the "ALJ") issued a decision that the Plaintiff is entitled to $ 1,496 of disability benefits per month retroactive to October 2, 2001. The ALJ considered the Plaintiff's own testimony, the evidence of Dr. Goodman and Dr. Hack, and the evidence of state agency physicians, who were of the opinion that the Plaintiff was not disabled. The ALJ concluded that the Plaintiff has been "disabled" within the meaning of the Social Security Act since October 2, 2001 because the "claimant's severe pain, limitations and restrictions . . . prevent [] her from performing her past relevant work" and because she has suffered a "substantial loss of ability necessary to perform a significant number of jobs identified in unskilled sedentary occupational base[.]"

Based on this favorable decision, the Plaintiff again requested that Liberty review the denial of LTD benefits and submitted a new letter from Dr. Goodman. Liberty replied on June 3, 2004 that the Social Security Disability benefits decision did not affect their prior denial determination. On August 23, 2004, Liberty reaffirmed in a letter again signed by [*18] Michelle Scott that the December 10, 2002 denial was its final determination and that it was not contingent on the Social Security Disability benefits award.

### b. Procedural History

On September 17, 2004 the Plaintiff filed an action against the Defendants in Suffolk Superior Court of the Commonwealth of Massachusetts seeking benefits allegedly due under ERISA, *29 U.S.C. § § 1132(a) (1) (B), (2)* and *(3)* and for breach of contract. On October 27, 2004, the Defendants served notice of removal of the original action to this Court. The Plaintiff has not pursued her breach of contract claim in this Court; in any event, I find that it is pre-empted by ERISA. *See generally Hampers v. W.R. Grace & Co., 202 F.3d 44, 51-53 (1st Cir. 2000)* and *29 U.S.C. § 1144(a)*. With respect to the Plaintiff's allegation in paragraph 27 of her Complaint that she "is entitled to relief against the Plan and Liberty to recover benefits due to her under the terms of the Plan, to enforce her rights to benefits under the Plan and to clarify her rights to future benefits under the Plan", I find, as a preliminary matter, that the appropriate civil [*19] enforcement provision for this "traditional benefits claim" is *29 U.S.C. § 1132(a) (1) (B)*, not *29 U.S.C. § § 1132(a) (2)* n7 and *(3)* n8 as alleged in her Complaint. *Fenton v. John Hancock Life Ins. Co., 400 F.3d 83, 86 (1st Cir. 2005)*.

n7 *29 U.S.C. § 1132(a) (2)* allows a participant, beneficiary or fiduciary to bring a civil action for appropriate relief under *29 U.S.C. § 1109*, which makes a fiduciary personally liable to make good to a plan any losses to the plan resulting from a breach of his or her fiduciary duty, and to restore to such plan any profits of such fiduciary. Furthermore, *§ 1109* subjects the fiduciary to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. In this case, the Plaintiff is not asking for this relief.

n8 *29 U.S.C. § 1132(a)(3)* has been called ERISA's "catch all" provision. *Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 108 (1st Cir. 2002)*. The Supreme Court has interpreted the provision as "a safety net, offering appropriate equitable relief for injuries caused by violations that *[§ 1132]* does not elsewhere adequately remedy." *Id. at 110*, citing *Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)*. In this traditional benefits denial case, *29 U.S.C. § 1132(a) (1) (B)* provides an adequate remedy.

[*20]

The Plaintiff filed a Motion for Focused Pre-Trial Discovery Relating to the Scope of the Administrative Record with *Rule 7.1* Certification. I granted this motion to the extent of requiring the Plaintiff to file a separate motion to supplement the record with the product of this discovery, which she has done in her Motion to Complete the Record on Review with *Rule 7.1* Certification. In response, the Defendants have now filed a Motion to Strike references to the discovered documents in the Plaintiff's Facts.

The Plaintiff and the Defendants also filed motions for orders contending respectively that the review would be de novo review and arbitrary and capricious review. I denied both standard of review motions without prejudice to being developed in their motions for summary judgment. Neither the Plaintiff nor the Defendants has bothered to develop their standard of review arguments further in the motions for summary judgment currently before me. Both have chosen simply to refer to their initial memoranda.

## II. DISCUSSION

### a. Standard of Review

1. Summary Judgment in ERISA Actions -- Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, [*21] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. *Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)*. In deciding a typical cross-motion for summary judgment, courts must consider each motion separately, drawing inferences against each movant in turn. *Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)*.

The standard of review in an ERISA case differs from the review in an ordinary civil case, where summary judgment serves as a procedural device designed to screen out cases that present no trialworthy issues. *Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002)*. In a typical "ERISA benefit denial case, trial is usually not an option: in a very real sense, the district [*22] court sits more as an appellate tribunal than as a trial court. It does not [usually] take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Id. at*

*17-18.* Thus, in a typical ERISA case, "where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue" regardless of the degree of deference owed to the plan fiduciary, as discussed in the following sub-section. *Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).* "This means the non-moving party is not entitled to the usual inferences in its favor." *Orndorf, 404 F.3d at 517.* n9

n9 I note, however, that the First Circuit has not consistently articulated this last point. In another 2005 ERISA case, the First Circuit held that the operative inquiry under the deferential standard of review is "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005)*(emphasis supplied) citing *Twomey v. Delta Airlines Pension Plan, 328 F.3d 27, 31 (1st Cir. 2003),* which in turn cites *Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2000).*

While Orndorf involved de novo review of the insurer's denial, the First Circuit clearly stated that "the use of summary judgment in this way [including no usual inferences for the non-moving party] is proper regardless of whether our review of the ERISA decision maker's decision is de novo or deferential." *Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).* Furthermore, in Orndorf, the First Circuit cites to *Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003),* a deferential review case, where the Court held that "assuming that the decision is to be made by the judge based solely on the record made at the administrative level, summary judgment is merely a mechanism for tendering the issue and no special inferences are to be drawn in favor of a plaintiff resisting in summary judgment; **on the contrary, the rationality standard tends to resolve doubts in favor of the administrator.**" (emphasis supplied).

[*23]

2. De Novo or Deferential Review -- Whether a de novo or deferential standard of review applies to an ERISA action depends on the degree of deference owed the original decision-maker. This standard remains the same through all stages of federal adjudication. *Leahy, 315 F.3d at 17.* The Supreme Court determined in *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)* that "a denial of benefits challenged under § 1132 (a) (1) (B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If, however, "the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." *Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005)*(internal citation and quotation omitted).

In this case, the Defendants argue that Section 7 of the Disability Policy "provides a clear grant of discretionary authority [*24] to Liberty by allocating to it the right to make factual findings, to determine eligibility for benefits, and/or to interpret the terms of the Plan." Section 7 provides:

### Interpretation of the Policy

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding. [A.R.I, p. 35.]

According to the Disability Policy, Liberty also "reserves the right to determine if the Covered Person's Proof of loss is satisfactory."

To apply the Firestone test in Leahy, the First Circuit considered the wording of the Plan documents, which gave MetLife, the claims administrator, "the exclusive right, in [its] sole discretion, to interpret the Plan and decide all matters arising thereunder" and further provided that any decision by MetLife in the exercise of that authority "shall be conclusive and binding on all persons unless it can be shown that the . . . determination was arbitrary and capricious." The First Circuit found that "this discretionary grant hardly [*25] could be clearer" and applied the arbitrary and capricious standard. The same can be said here. See also *Brigham v.*

Case 1:03-cv-12389-GAO   Document 28-36   Filed 02/08/2006   Page 9 of 13

Page 9
2005 U.S. Dist. LEXIS 27180, *

*Sun Life of Canada*, 317 F.3d 72, 81-82 (1st Cir. 2003) (reaffirming that "there are no magic words' determining the scope of judicial review of decisions to deny benefits").

The Plaintiff does not contest that the wording in Section 7 is a sufficiently clear grant of discretionary authority, rather she argues that Liberty's denial of her LTD benefits claim should be subject to de novo review because, as I understand the argument, no grant of discretionary authority was given to GenRad, the default plan administrator, or delegated by GenRad to Liberty. According to the Plaintiff, Section 7 of the Disability Policy is not a valid delegation of discretionary authority because it is not an ERISA plan instrument and Liberty cannot grant discretion to itself.

The Plaintiff points to *29 U.S.C. § 1002(16) (A) (ii)* for the proposition that since the Disability Policy does not specify who the Plan Administrator is, it must be GenRad, the Plan Sponsor. And since GenRad has not delegated its administrative authority to Liberty in a written [*26] instrument as required by *29 U.S.C. § 1105 (c)* and Firestone, the review must be de novo. For support, the Plaintiff cites to cases including *Davidson v. Liberty Mutual Ins. Co*, 998 F.Supp. 1 (D.Me. 1998). In Davidson, the claimant had been employed by Liberty Mutual. The LTD plan vested discretionary authority in Liberty Mutual, the employer and Plan Administrator. Liberty Mutual designated Liberty Life, a subsidiary of Liberty Mutual, to administer the LTD plan, but the District Court found that it failed properly to delegate its fiduciary duties and discretionary authority as plan administrator as required by *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir. 1993).

The Plaintiff's reference to cases such as Davidson and her consequent line of reasoning miss the point. The Plaintiff has sued Liberty, not GenRad, as the defacto administrator and fiduciary of GenRad's LTD Benefits Plan. Although the Disability Policy does not specifically name Liberty as the "Plan Administrator" as anticipated by *29 U.S.C. § 1002(16) (A) (i)*, all of the documents in the administrative [*27] record support the Plaintiff's own assertion in her Complaint that Liberty has acted as the defacto administrator in accordance with its administrative role outlined in the Disability Policy. See also *Cook v. Liberty Assurance Co. of Boston*, 320 F.3d 11, 13 (1st Cir. 2003)(where the Court treated Liberty as the administrator where the employer offered LTD benefits under insurance policies provided and administered by Liberty.) Furthermore, the record unequivocally shows that Liberty is a fiduciary within the meaning of ERISA because it acted in the capacity of manager and administrator of GenRad's LTD Benefits Plan. See *Pegram v. Herdrich*, 530 U.S. 211, 222, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000) and *29 U.S.C. § 1002(21) (A) (i)* and *(iii)*. In this case, unlike Davidson and Rodriguez-Abreu, the written policy gives the challenged decision-maker, here Liberty, the discretionary authority to determine eligibility for benefits and to construe the terms of the plan. Thus, there are no issues of improper delegation.

Where, as here, the underlying plan reserves discretion to the insurer who is also acting as the plan administrator, the insurer's denial [*28] of benefits is reviewed under the arbitrary and capricious standard. See e.g. *Cook*, 320 F.3d at 18; *Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.*, 230 F.3d 415, 418 (1st Cir. 2000); *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 56-57 (1st Cir. 1999); and *Giannone v. Metropolitan Life Ins. Co.*, 311 F.Supp.2d 168, 174-75 (D.Mass. 2004). This standard means that a "decision to deny benefits to a beneficiary will be upheld if the administrator's decision was reasoned and supported by substantial evidence. Evidence is substantial when it is reasonably sufficient to support a conclusion. Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Wright*, 402 F.3d at 74 (internal citations and quotations omitted). n10

> n10 The Defendants argue that Liberty's decision should be upheld because it was "plausible" based on the administrative record as a whole. As support for this standard, the Defendants referred in post hearing briefing to *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002), where the First Circuit held that "the arbitrary and capricious standard asks only whether a factfinder's decision is **plausible** in light of the record as a whole, see, e.g., *Pari-Fasano v. ITT Hartford Life & Accid. Ins. Co.*, 230 F.3d 415, 419 (1st Cir. 2000) or, put another way, whether the decision is supported by substantial evidence in the record, *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, at 184." (emphasis supplied). Neither Pari-Fasano, nor Doyle, nor the cases cited by those decisions, use the term "plausible". To the extent the Defendants suggest that Judge Selya's choice of alternative words directs a more deferential standard of review, I reject the suggestion and find the formulation in Wright to be the full and complete standard for which the word "plausible" used in Leahy was meant in context to provide a

Case 1:03-cv-12389-GAO   Document 28-36   Filed 02/08/2006   Page 10 of 13

Page 10
2005 U.S. Dist. LEXIS 27180, *

shorthand statement without diluting the standard.

[*29]

### b. Conflict of Interest & Heightened Standard of Review

In applying the arbitrary and capricious standard, I must consider the administrator's conflict of interest as a factor if such a conflict is established. *Wright, 402 F.3d at 74.* "In this Circuit, if a court concludes there is an improper motivation amounting to a conflict of interest, the court may cede a diminished degree of deference -- or no deference at all -- to the administrator's determinations." Id. (internal citations and quotations omitted); see also *Fenton, 400 F.3d at 90 (1st Cir. 2005)* ("The financial self-interest of a plan administrator may warrant arbitrary and capricious review with more bite.'")

The burden is on the claimant to demonstrate a conflict of interest. *Wright, 402 F.3d at 74, n. 4.* The conflict must be real; "a chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due." Id. at 74, citing *Leahy, 315 F.3d at 16.* While Liberty is both the payor of benefits and the administrator with respect to the LTD benefits, the case law clearly [*30] precludes me from finding that the potential for Liberty to deny claims to maximize its profit is sufficient, in and of itself, to establish a conflict of interest. n11

---

n11 See e.g. *Pari-Fasano, 230 F.3d at 418,* where the Court acknowledged that an insurer "does have a conflict of sorts when a finding of eligibility means that the insurer will have to pay benefits out of its own pocket," but determined that the market presents competing incentives that substantially minimize the apparent conflict of interest. In Wright, the First Circuit considered itself bound by well-established precedent to maintain the degree of deference for insurer/administrator decisions even though the rationale relied upon in decisions like Pari-Fasano might overstate the ability of market forces to minimize the apparent conflict and "other circuits have rejected the market forces rationale and specifically recognized a conflict of interest when the insurer of an ERISA plan also serves as plan administrator." *Wright, 402 F.3d at 75, n. 5.*

---

[*31]

Given this limitation, the Plaintiff argues that a heightened standard of review is nevertheless appropriate here because (1) the "lucrative financial relationship" between Liberty and NMR suggests bias, and (2) "Liberty engaged in a whole host of conduct, that demonstrates it acted as an adversary, rather than a fair adjudicator of a claim for benefits." I will address the two grounds in turn.

1. The Liberty and NMR Financial Relationship -- Before considering the merits of this argument, I must first determine whether or not the Plaintiff may supplement the administrative record with documents related to the financial relationship between Liberty and NMR, which she received pursuant to my order for discovery. As pointed out by the Defendants, "the decision as to whether to allow discovery is distinct from the decision as to whether to allow consideration of additional evidence." *Allison v. UNUM Life Ins. Co., 2005 U.S. Dist. LEXIS 3465, *34 (E.D.N.Y. Feb. 11, 2005).* Where, as here, the review is under the arbitrariness standard, the ordinary question is whether the administrator's action on the record before him was unreasonable. *Cook, 320 F.3d at 19* [*32] (emphasis supplied). However, the First Circuit has not adopted an "ironclad" rule against new evidence. *Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, (1st Cir. 2003).* Supplementation may be needed where the decisional process was too informal to provide a record or when certain kinds of claims are raised that by "their nature or timing take a reviewing court to materials outside the administrative record." Id. "Still, at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." Id. Here, the Plaintiff argues that the documents are relevant to the issue of whether Liberty has been improperly motivated amounting to a conflict of interest. This is a sufficient reason. A claimant cannot meet the burden of demonstrating a conflict of interest if she cannot supplement the record with relevant evidence.

As support for her argument that the financial relationship between Liberty and NMR proves that Liberty was improperly motivated, the Plaintiff cites to *Darland v. Fortis Benefits Ins. Co., 317 F.3d 516 (6th Cir. 2003),* where the Sixth Circuit [*33] held that "the district court should have considered whether [the administrator] was operating under an apparent conflict of interest when it denied [the claimant]'s claim for continued LTD benefits." Id. at 527. In that case, the Court noted that the Sixth Circuit recognizes that "there is an actual, readily apparent conflict here, not a mere potential for one, when the insurance company/plan administrator is the insurer that ultimately pays the benefits." Id. The Court then further justified the departure from the arbitrary and capricious standard

because the administrator/insurer's "ultimate disability determination was based upon the peer review' panels selected by Network Medical Review Company, which [the administrator/insurer] had contracted to assess [the claimant]'s claim. As the plan administrator, [the administrator/insurer] had a clear incentive' to contract with a company whose medical experts were inclined to find in its favor that [the claimant] was not entitled to continued LTD benefits." *Id. at 527-28.*

The persuasiveness of the Darland decision is limited because the First Circuit does not recognize that the [*34] dual role of insurer and administrator alone establishes a real conflict of interest. See Note 9 supra and accompanying text. Furthermore, as the Defendants point out, the second part of the Darland Court's justification is questionable given the Supreme Court's subsequent decision in *Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003)*, which rejected the rule advocated in Darland that ERISA requires plan administrators to accord special deference to opinions of treating physicians. As part of its reasoning, the Supreme Court explained:

> We [do not] question the Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of not disabled' in order to save their employers money and to preserve their own consulting arrangements. . . . If a consultant engaged by a plan may have an "incentive" to make a finding of not disabled,' so a treating physician, in a close case, may favor a finding of disabled.'

*Black & Decker, 538 U.S. at 832* (internal citations and quotations omitted).

This explanation stands as a cautionary reminder that both the Plaintiff's [*35] treating physicians and the administrator/insurer's reviewing physicians are potentially affected by inherent incentives and biases. Nonetheless, I take the First Circuit's reluctant concurrence with past precedent in Wright as a suggestion that additional evidence of the ERISA plan administrator's efforts to maximize profits could be enough to turn apparent conflict into real conflict.

The supplemental evidence shows that Liberty paid over two million dollars ($ 2,004,656.00 to be exact) to Network Medical Review -- Elite Physicians from 2001 through 2003. While this amount shows that NMR certainly has a financial interest in maintaining its medical consulting business with Liberty, any reviewing physician or network of physicians hired by an administrator/insurer has the potential to be affected by the inherent pressure of giving conservative opinions in order to receive more consulting contracts. To demand greater scrutiny on review, there must therefore be something more.

In this case, I ordered Liberty to produce certain documents requested by the Plaintiff, which related to Liberty's relationship with NMR, and to answer the Plaintiff's interrogatory about the number of [*36] files that Liberty and its affiliated companies had referred to NMR and NMR's affiliated companies or entities. I also ordered Liberty to stipulate the number of cases where "they [NMR] have accepted a claim", which Liberty understood to mean stipulating "the number of claims accepted or granted and rejected or denied after a review by a physician retained through NMR and/or Elite Physicians, Ltd." Without moving to modify my order, Liberty refused to make such a stipulation claiming that it was "unable to provide this information . . . due to the very substantial burden and expense that would be involved in retrieving and manually reviewing the over 1,200 claims files that were referred to NMR physicians from 2001 to 2003." Under the circumstances, where a party is under court order to provide information pursuant to stipulation and the party fails to comply without seeking relief from the court, I will, as a sanction, draw the inference suggested by the Plaintiff, namely that NMR has not found in favor of a single claimant in connection with the 1,204 Liberty files referred to NMR during the years 2001 -- 2003. This gives Liberty a "clear incentive" to contract with NMR to obtain [*37] peer reviews that support denial of disability benefits, justifying a review with "more bite". However, in calibrating the sanction, I will only apply the heightened standard of review to Liberty's reliance on Dr. Bomalaski's opinion, the only product of the colorably conflicted relationship with NMR.

2. Liberty's Conduct as an "Adversary" -- In a further effort to meet her burden of demonstrating that Liberty operated under a conflict of interest throughout her claims process, the Plaintiff argues that "Liberty engaged in a whole host of conduct, that demonstrates that it acted as an adversary, rather than a fair adjudicator of a claim for benefits." In attempting to show that Liberty was improperly motivated when it evaluated her claim for this reason, the Plaintiff lists the following conduct: (a) Liberty provided inconsistent reasons for denying the

Case 1:03-cv-12389-GAO    Document 28-36    Filed 02/08/2006    Page 12 of 13

Page 12
2005 U.S. Dist. LEXIS 27180, *

Plaintiff's claim; (b) Liberty relied on an opinion of the wrong type of medical specialist; (c) Liberty rejected the finding of disability by the United States Social Security Administration; (d) Liberty pretended it did not participate in the STD analysis; (e) Liberty added a requirement of objective evidence not contained [*38] in the policy; (f) Liberty failed to follow the Department of Labor claims regulations and ERISA; and (g) Liberty did not properly analyze the Independent Medical Exam physician opinion or that of the treating doctor.

The Defendants wrongly criticize this part of the Plaintiff's argument for heightened review as "merely an attempt to circumvent the controlling authority." The Supreme Court has made it clear that where the plan fiduciary exercising the discretion operates under a "conflict of interest", this is a "factor" in determining whether discretion has been abused. *Firestone, 489 U.S. at 115.* "What constitutes a conflict and how the factor is to be weighed were not explained, and naturally the cases in the lower courts [and other Circuits] are now somewhat divided." *Doe v. Travelers Ins., 167 F.3d at 57.* Clearly the administrator/insurer's own financial interest in the decision is insufficient in and of itself to constitute a conflict in this Circuit, but the First Circuit has yet to decide how else a claimant might establish the existence of a conflict of interest. Thus, the Plaintiff properly looks to decisions in other Circuits relating [*39] to other ways of establishing conflicts of interest. I note that similar factual-based arguments were raised in *Wright, 402 F.3d at 76.* Although both the District Court and the First Circuit found each factual claim unpersuasive in Wright, the First Circuit has been open to the idea that the claimant may meet his or her burden by coming forward with something amounting to "material, probative evidence, beyond the mere fact of the apparent [administrator/insurer] conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary" or participant. *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech. Inc., 125 F.3d 794, 798 (9th Cir. 1997).* n12 Consequently, I examine each factual argument in turn, recognizing that my discussion will have applicability as well to merits review against the arbitrary and capricious standard.

---

n12 Although the First Circuit seems to have rejected a precursor to *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech. Inc., 125 F.3d 794, 798 (9th Cir. 1997),* the decision in *Atwood v. Newmont Gold Co., 45 F.3d 1317 (9th Cir. 1995),* which outlined a method for "presuming conflict and shifting burden of proof to insurer," *id. at 1322-23,* I find that the First Circuit has not rejected conflict of interest analysis that is unrelated to the administrator/insurer's financial interest. See *Doe v. Travelers Ins. Co., 167 F.3d 53, 57, n. 2 (1st Cir. 1999)* and *Wright, 402 F.3d at 75, n. 5.*

---

[*40]

a. Inconsistent Reasons for Denial -- The Plaintiff argues that "Liberty first contended that Denmark's fibromyalgia was not disabling. Then, after an examination by an Independent Medical Examiner, who determined that Denmark was suffering from fibromyalgia and was completely disabled, Liberty changed its position and contended that she might not even be afflicted by fibromyalgia." Even if inconsistent reasons might be an indication that the insurer's decision has been tainted by self-interest, see *Lang, 125 F.3d at 799* and *Brown v. Blue Cross and Blue Shield of Alabama, Inc., 898 F.2d 1556, 1569 (11th Cir. 1999),* I find that Liberty's reasons for denying her claim were sufficiently consistent to avoid taint on that basis.

After reviewing the opinions of Dr. Goodman and Dr. Miller, Nurse Kaye initially questioned whether her fibromyalgia was disabling and pointed to the fact that there was no evidence to support a change in her condition in October 2001. This is reflected in the STD benefits denial in the December 26, 2001 letter.

After reviewing the opinions of Dr. Miller, Dr. Schur and Dr. Bomalaski, Liberty continued to find that there [*41] was no significant change in her condition in October 2001 that would preclude her from performing the duties of her occupation. While it is true that Liberty mentioned in the December 10, 2002 LTD benefits denial that Doctors Schur and Bomalaski questioned the diagnosis, this is explained by Liberty's incorporation by reference of the later medical opinions. There is no showing of material inconsistencies in the actual reasons for denial of benefits.

b. Reliance on the wrong type of medical specialist -- Next the Plaintiff argues that instead of having a rheumatologist examine her or review her file, Liberty relied on file review by a physical medicine and rehabilitation doctor (Dr. Miller). According to the Plaintiff, "this was wrong, and indicative of a conscious effort to deny benefits." Even if deliberate reliance on the wrong type of medical evidence could show that Liberty breached its fiduciary duty, n13 the Plaintiff misconstrues the record and assumes that since fibromyalgia is a rheumatic disease, the only relevant specialist is a rheumatologist. See *Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).*

n13 The cases to which the Plaintiff cites are cases where the type of specialist relied on was a factor in deciding whether the denial of benefits was an abuse of discretion or arbitrary and capricious, not whether or not there was a conflict of interest. See *Monroe v. Pacific Telesis Group Comprehensive Disability Benefits Plan, 971 F.Supp. 1310, 1314-15 (C.D. Cal. 1997)* and *Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1123 (9th Cir. 1998)* citing *Kunin v. Benefit Trust Life Ins., 910 F.2d 534, 538 (9th Cir. 1990)* for the proposition that inadequate investigation and reliance on non-experts in field failed to provide reasonable basis for ERISA administrator's determination. However, I note that Wright could be read as suggesting that the denial of benefits without a review by any physician (and by analogy perhaps without review by the proper specialist), could show bad faith or improper motivation, unless the treating physician's report supported a finding of no disability. *Wright, 402 F.3d at 77.*

[*42]

First, specialists in the field of physical medicine and rehabilitation, like Dr. Miller, are called physiatrists. According to the American Academy of Physical Medicine and Rehabilitation, "physiatrists focus on restoring function. They care for patients with acute and chronic pain, and musculoskeletal problems like back and neck pain, tendonitis, pinched nerves and **fibromyalgia**." (emphasis supplied) [See http://www.aapmr.org/.] Since the Plaintiff has not provided any evidence that administrators should only consult rheumatologists when deciding claims involving fibromyalgia, consulting a physical medicine and rehabilitation specialist does not show that Liberty was improperly motivated or acted unreasonably as discussed below.

Second, Liberty did not "rely" on Dr. Miller's opinion alone; it also considered the opinion of two rheumatologists, Dr. Schur and Dr. Bomalaski, in addition to Dr. Goodman. In its initial denial of the Plaintiff's claim for LTD benefits dated August 20, 2002, Liberty based the denial in part on Dr. Miller's opinion that there were no findings indicating a significant change in October 2001, but also on the opinion of Dr. Schur, who the Plaintiff [*43] acknowledges as a board certified rheumatologist. When Liberty denied the Plaintiff's appeal, it also referred to the opinion of another rheumatologist, Dr. Bomalaski.

The Plaintiff attempts to discredit Dr. Bomalaski's report by suggesting that Liberty did not provide him with a complete set of medical records based on his statement that "the physical examination and testing do not support the diagnosis of Ms. Denmark's treating physicians, **at least with the records provided.**" (emphasis supplied). Dr. Bomalaski's comment must be read in the context of his footnote referencing Wolfe, F. et al. *The American College of Rheumatology 1990 criteria for the classification of fibromyalgia: report of the multicenter criteria committee*, 33(2) Arthritis & Rheumatology 160-72 (1990). This article sets out the two criteria -- widespread pain that has been present for at least 3 months and pain in 11 of 18 tender point sites on digital palpation -- for satisfying the classification for fibromyalgia according to the authors. Nurse Kaye referred to the same criteria when she noted that "it is unclear from [Dr. Malanoski's] office notes if [the claimant's symptoms] meet the criteria [*44] for the establishment of the [diagnosis] of fibromyalgia as defined by the American College of Rheumatology which includes widespread pain for at least 3 months, & pain in 11/18 specified tender points upon exam." The fact that Dr. Malanoski never made reference to the two criteria in his notes in the record sufficiently explains Dr. Bomalaski and Nurse Kaye's comments.

c. The Social Security Decision -- Within the reliance on the wrong type of medical specialist' section of her argument, the Plaintiff also suggests that Liberty's refusal to consider the decision of the Social Security Administration ("SSA") shows that Liberty was improperly motivated. The Plaintiff specifically raises this argument as an attempt to prove that Liberty abused its discretion. The argument is unconvincing in both contexts even though it is true that "although the SSA's determination of a claimant's entitlement to social security disability benefits is not binding on disability insurers, it can be relevant to an insurer's determination whether that claimant is eligible for disability benefits." *Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 215 (1st Cir. 2004).*

Liberty rendered [*45] its first decision with respect to the Plaintiff's claim for LTD benefits on August 20, 2002. Liberty informed the Plaintiff of her right to appeal Liberty's determination and her right to bring an action under *section 502 of ERISA*. Liberty informed the Plaintiff that should she request administrative review, Liberty would notify her of its "final decision" within the statutory time requirements. The Plaintiff appealed the decision on September 24, 2002 and subsequently forwarded a new report by psychologist Dr. Taylor. Liberty considered the new report and sought additional