evidence in the form of a labor market survey and vocational review, a surveillance investigation and a medical review by another rheumatologist. After receiving Dr. Bomalaski's review, Liberty declined to alter its original determination in a letter dated December 10, 2002. In that letter, Liberty wrote that the Plaintiff's "administrative right of review has been exhausted and no further review will be conducted by Liberty," but that she had a right to bring an action for judicial review under *section 502 of ERISA*. Liberty also wrote that "decisions rendered by the Social Security Administration or Workers' Compensation [*46] are not determinative of entitlement to benefits under the terms and conditions of the GenRad Inc.'s Group Disability Income Policy." On January 13, 2004, more than 13 months later, the SSA issued a favorable decision for the Plaintiff.

I set out all of these dates to emphasize the timing. Liberty cannot have failed to consider the SSA's decision in bad faith when it issued its decisions in August and December 2002 since the SSA did not issue its decision until more than 13 months after its final decision. Cf. *Calvert v. Firststar Finance, Inc., 409 F.3d 286 (6th Cir. 2005)*, where the SSA's decision was issued more than two years before Liberty denied the claimant's appeal. In this connection, it bears emphasizing that the First Circuit has observed that "in order to find that an insurer had abused its discretion under the contract, we would have to conclude that the insurer's eligibility determination was unreasonable in light of the information available to it" **when it made its decision.** *Pari-Fasano, 230 F.3d at 419*. See also *Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 186 (1st Cir. 1998)* (considering a later report [*47] only to "lend color to the earlier appraisals relied upon by" the administrator).

Plaintiff refines its argument by contending that Liberty's failure to reconsider its decision in light of the SSA decision shows that it is improperly motivated. I disagree. The regulations adopted pursuant to the "full and fair review" ERISA provision, *29 U.S.C. § 1133(2)*, do not require administrators of disability policies to afford additional review. Rather, *29 C.F.R. § 2560.503-1(g)(1)(1977)* n14, like the current version, only requires that "every plan shall establish and maintain a procedure by which a claimant . . . has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary of the plan, . . . and under which a full and fair review of the claim and its denial may be obtained." The Plaintiff does not suggest that either the Disability Policy or Liberty's letter notifying the Plaintiff of its adverse benefit determination on review offered or required yet another level of appeal in addition to the mandatory "full and fair review". n15 More fundamentally, "the decision

to which judicial review is addressed is the final [*48] ERISA administrative decision. It would offend interests in finality and exhaustion of administrative procedures required by ERISA to shift the focus from that decision to a moving target by presenting extra-administrative record evidence [in this case the SSA decision] going to the substance of the decision." *Orndorf, 404 F.3d at 519*. Thus, I find that Liberty neither abused its discretion, nor acted as an adversary when it declined to reconsider its denial in light of the SSA decision in the two letters dated June 3, 2004 and August 23, 2004.

n14 The regulations were amended in 2000, but the amended version only applies to claims filed on or after January 1, 2002. *29 C.F.R. § 2560.503-1(o) (1)*.

n15 The current version of the regulations permits two levels of mandatory appeal of an adverse benefit determination, *29 C.F.R. § 2560.503-1(c) (3) (2005)*, and contemplates additional "voluntary" levels of appeal, see *29 C.F.R. § § 2560.503-1(c)(3) and (j)(4)(2005)*. However, neither the 1977 version nor the current version of the regulations require more than one level of internal review.

[*49]

d. Liberty's participation in the STD analysis -- The Plaintiff's argument that Liberty pretended it did not participate in the STD analysis is wholly without merit. The evidence clearly shows that Liberty served as the disability claims administrator for the STD plan, providing an initial claims review and decision for STD claims by GenRad employees, but that the employer, Teradyne by the time of the appeal, made the appeals decision. Liberty has never pretended otherwise.

e. Objective Evidence Requirement -- I am also unconvinced by the Plaintiff's argument that Liberty acted as an adversary by adding a requirement of "objective medical evidence" that is not contained in the Disability Policy, but not for the dismissive reasons suggested by the Defendants.

In the context of reviewing the Plaintiff's STD claim, Nurse Kaye sought a peer review from Dr. Miller asking him if "the accompanying documentation provide[s] objective findings that would indicate a significant change in condition that was evident on or about the date of the disability (10/03/2001)?" Dr. Miller answered "No" because "there are no objective physical functional deficits documented and the patient had [*50] a normal cardiac exercise test 11/09/2001." He further explained

2005 U.S. Dist. LEXIS 27180, *

that "there are no documented objective physical exam findings that support a decrease or significant change in this patient's physical condition. In fact, the patient had a normal cardiac exercise test 11/09/2001. Therefore, the medical records provided do not substantiate that the patient's condition significantly changed about the time of 10/03/2001."

In justifying its initial LTD denial, Liberty quoted Dr. Miller's conclusion that "the documentation provided does not indicate a significant change in the patient's condition about the time of disability 10/03/2001 because there are no objective physical functional deficits documented and the patient had a normal cardiac exercise test 11/09/2001." In its December 2002 denial, Liberty rephrased Dr. Miller's findings as "there were no documented changes in the physical finding of the exam that supported a decrease or significant change in the claimant's condition. . . . Dr. Miller concluded that the medical records did not substantiate that the patient's condition had changed significantly as of October 3, 2001, to warrant a cessation from work."

Citing Cook, the Plaintiff [*51] claims that Liberty acted improperly because "it is black letter law that a reviewing insurance company cannot add the requirement of objective medical evidence' to a Plan that does not expressly contain that language." I find the Plaintiff's reference to Cook fails to appreciate the subtle, but important distinction brought to light in *Boardman v. Prudential Ins. Co. of America, 337 F.3d 9, 17, n. 5 (1st Cir. 2003).*

In many instances, an administrator would be justified by requiring objective evidence from tests that were independent of the claimant's reporting of her symptoms. *Cook, 320 F.3d at 21.* While fiduciaries have a duty to see that those entitled to benefits receive them, they also have a duty to protect the plan's assets against spurious claims. *Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 807-08 (10th Cir. 2004).* However, where the nature of the disease or condition is such that there is no dipstick' laboratory test, it would not be "reasonable for [the administrator] to expect [the claimant] to provide convincing clinical objective' evidence that she was suffering from" the disease or condition. *Cook, 320 F.3d at 21* [*52] (where the claimant suffered from chronic fatigue syndrome and fibromyalgia). The evidence in the administrative record suggests that fibromyalgia is such a condition because as Dr. Malanoski explained, it is a "condition lacking abnormalities in blood testing or specific abnormalities in physical exam." What the Plaintiff fails to appreciate, however, is that "while the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings,

the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." *Boardman, 337 F.3d at 17, n. 5.*

In Boardman, "Prudential did not require Boardman to present objective medical evidence to establish her illnesses. On the contrary, Prudential was willing to accept that Boardman suffered from the illnesses she reported to her doctors. Rather, Prudential wanted objective evidence that these illnesses rendered her unable to work." Id. Requiring the latter is permissible and does not make the administrator an adversary. Nurse Kaye's question of whether there were any "objective findings that would indicate a significant change in condition" around [*53] the date of disability appears to seek objective evidence of the permissible kind, namely objective evidence that supports a "severity of impairment that would preclude Ms. Denmark from performing her own occupational job duties as customarily performed." Thus, this argument also fails to demonstrate that Liberty operated under a conflict of interest. I will also address this issue on the merits in the reasonableness analysis.

Before turning to the Plaintiff's next conflict argument, I must point out, since the Plaintiff did not, that Dr. Bomalaski also used the controversial wording in his report. He found that "Ms. Denmark has areas of discomfort on examination, but objective findings such as abnormal laboratory tests are not provided in the medical records for review." His statement should, however, be read in the context of the preceding two paragraphs, where Dr. Bomalaski discussed the lack of objective laboratory tests ruling out other potential coexisting causes of her condition, and his subsequent discussion of the difficulty in assessing the limitations of her ability to function. Considering this context, I find that his reference to "objective findings" does not amount [*54] to the impermissible requirement of "objective findings" to establish the diagnosis of fibromyalgia. Although Dr. Bomalaski questioned the Plaintiff's diagnosis, as I discussed in Section II.b.2.b supra, Liberty does not cite his opinion as support for finding that the Plaintiff is not suffering from fibromyalgia, but that she is not so severely impaired that she is precluded from performing her own occupation.

f. Department of Labor claims regulations and ERISA -- The Plaintiff claims that Liberty failed to produce all of the documents requested as required by the governing regulations and that this shows it was improperly motivated.

The 1977 version of the regulations required plan administrators to provide every claimant who is denied a claim for benefits written notice setting forth (1) the

specific reason or reasons for the denial; (2) specific reference to pertinent plan provisions on which the denial is based; (3) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) appropriate information as to the steps to be taken if the participant or [*55] beneficiary wishes to submit his or her claim for review. *29 C.F.R. § 2560.503-1(f) (1)-(4) (1977).* A decision on review must "be in writing and [must] include specific reasons for the decisions . . . as well as specific references to the pertinent plan provisions." *29 C.F.R. § 2560.503-1(h) (3) (1977).* The August and December 2002 letters satisfy these requirements.

The Plaintiff's complaint revolves around the rule in *29 C.F.R. § 2560.503-1(g) (1) (ii) (1977)* that a claimant may "review pertinent documents". The 2000 amendments, which apply to claims filed on or after January 1, 2002, attempted to "clarify" this requirement in the 1977 regulations, by replacing the term "pertinent" with the term "relevant." *65 Fed. Reg. 70246, 70252, 2000 WL 1723740 (Nov. 21, 2000).* The amendment also states that a document, record, or other information is considered "relevant" if it was relied upon in making the determination, or was submitted to the plan, considered by the plan, or generated in the course of making the benefit determination, without regard to whether such document, record, [*56] or other information was relied upon in making the determination. *29 C.F.R. § 2560.503-1(m) (8) (i), (ii).* The Department of Labor "believed that these changes would make clear that claimants must be provided access to all of the information present in the claims record, whether or not that information was relied upon by the plan in denying the claim and whether or not that information was favorable to the claimant. Such full disclosure, which is what the 1977 regulation contemplated, is necessary to enable claimants to understand the record on which the decision was made and to assess whether a further appeal would be justified." *65 Fed. Reg. at 70252.*

Based on this provision, the Plaintiff wrote to Liberty in May 2004 requesting that Liberty produce "copies of the Summary Plan Description and the plan documents and [the] policy of insurance" and "all documents, including but not limited to pertinent documents which the claims administrator considered or relied upon when it decided to deny my benefits, both initially and after further review" as required by *29 C.F.R. § 2560.503-1(g).* From the Plaintiff's De [*57] Novo Memorandum, it appears Liberty complied with this request, except as to its internal claims guidelines, which I have since ordered produced, and a copy of the surveillance tape, which Liberty claims it was unable to

locate until January 2005 at which time it was provided to the Plaintiff.

I decline to find that Liberty's failure voluntarily to turn over either of these documents promptly after the May 2004 request indicates bad faith on its part during the claims investigation and determination period. See e.g. *Wright, 402 F.3d at 78* (declining to interpret the omission of the Summary Detail Report as an indication of bad faith). n16

    n16 I note that the current version of the regulations also requires administrators who relied on an internal rule, guideline, protocol, or other similar criterion in making the adverse determination, to disclose either the specific rule, guideline, protocol, or other similar criterion or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request. *29 C.F.R. § 2560.503-1(g)(1) (5) (A)* and *(j) (5) (i).* I find that this new requirement is not merely a clarification, but an amplification of the 1977 notice and disclosure requirements. As a result, Liberty cannot be faulted for failing to disclose any internal guidelines even if it relied on them prior to the Plaintiff's request.

[*58]

g. Analysis of the IME and treating doctor's opinion -- Finally, I come to the Plaintiff's ultimate argument that Liberty did not properly analyze the opinion of the IME physician (Dr. Schur) or that of the treating doctor, by which I assume she really meant "treating doctors" (Dr. Malanoski and Dr. Goodman). The crux of the Plaintiff's argument in her summary judgment motion is at bottom that the plan administrator arbitrarily refused to credit the claimant's reliable evidence, including the opinions of treating physicians. See *Black & Decker, 538 U.S. at 834.* I decline to consider the ultimate issue in the context of determining whether or not to apply an abuse of discretion standard of review with "more bite." This argument is more properly considered in the reasonableness analysis.

In sum, I reject the Plaintiff's contention that Liberty engaged in a whole host of conduct demonstrating that it operated under a conflict of interest deserving a heightened standard of review. As a result, I apply the traditional arbitrary and capricious or abuse of discretion review, other than with respect to Liberty's reliance on

Dr. Bomalaski's opinion.

### c. Additional [*59] Supplementation

Aside from the conflict of interest/heightened standard of review issue, the Plaintiff also seeks to supplement the record with Liberty's claims guidelines in place during the relevant time. The Plaintiff argues that these additional documents show the arbitrariness of Liberty's decision because they lack sufficient meaningful guidance for the case reviewers. For support, the Plaintiff cites *Glista v. Unum Life Insurance Co. of America, 378 F.3d 113 (1st Cir. 2004)*. Glista stands for the possibility that district courts may, and in certain circumstances must, supplement the record with "the plan administrator's own documents interpreting the language of the Plan and providing the standard for evaluation of the facts presented." *Glista, 378 F.3d at 122.* Cf. *Liston, 330 F.3d at 25-26*, where the First Circuit was concerned with the different problem of whether or not to supplement the record with facts about other persons that were not before the administrator. However, as the Defendants point out, the First Circuit did not intend to create a "hard-and-fast rule[]" that manuals and training materials will always [*60] be admissible for judicial review. *Glista, 378 F.3d at 115.* Rather, the Court recognized that "the weight and admissibility of internal documents, whether those documents are offered in support of the interpretation of the plan administrator or that of the claimant, will vary with the facts of each case. Such documents are most likely to be relevant where they have been authenticated, have been generated or adopted by the plan administrator, concern the policy in question, are timely to the issue in the case, are consistently used, and were known or should have been known by those who made the decision to deny the claim. Where a plan administrator has chosen consistently to interpret plan terms in a given way, that interpretation is relevant in assessing the reasonableness of the administrator's decision." *Id. at 123* (internal citation omitted) (emphasis supplied). On this point, "Courts have long recognized that such consistency is required even under the most deferential judicial standard of review." *Id. at 123, n. 3* citing *65 Fed. Reg. at 70251*.

Without repeating my earlier supplementation discussion, see [*61] Section II.b.1 supra, I agree with the Defendants that the internal guidelines are not relevant to a disputed "interpretation" of the Disability Policy. The dispute in this case centers on the reasonableness of Liberty's evaluation of the evidence available at the time, not on the meaning of certain provision of the Disability Policy or the adequacy of the procedures. Thus, I deny the Plaintiff's motion to supplement the record with Exhibit B.

### c. Review of the Denial

Having addressed all preliminary matters, I am now in a position to address the merits and determine whether Liberty's decision was arbitrary and capricious against the Wright standard. See Note 10 supra and accompanying text. The Plaintiff argues that even under the deferential arbitrary and capricious standard Liberty's denial of her LTD benefits claim was not supported by substantial evidence. While the Plaintiff raises numerous arguments, the crux of her appeal is that Liberty's denial unreasonably relied on the opinions of Dr. Bomalaski, Dr. Miller and Nurse Kaye that there is no evidence that her condition worsened in October 2001 to the point where she could no longer carry-out the duties [*62] of her occupation, while unreasonably rejecting the opinion of Dr. Schur, Dr. Taylor, and Dr. Malanoski that she was disabled. n17 I do not focus on the opinions of Dr. Taylor or Dr. Hack because neither of their reviews are directly probative of her disability.

> n17 As stated above in Section II.b.2.c supra, Liberty did not abuse its discretion when it declined to reconsider its final administrative decision in light of the SSA decision or the evidence considered therein.

In reviewing Liberty's decision under the arbitrary and capricious standard, I consider the administrative record and the supplemental evidence to determine whether Liberty's decision was reasoned and supported by substantial evidence. My review is deferential, but as pointed out by the Plaintiff, I am not simply a "rubber stamp". *Lopes v. Metropolitan Life Ins. Co., 332 F.3d 1, 5 (1st Cir. 2003)*. This means I must answer the question, "not which side [I] believe is right, but whether [Liberty] had substantial evidentiary [*63] grounds for a reasonable decision in its favor." *Doyle, 144 F.3d at 184.*

In ERISA benefits claims, the claimant has the burden of showing that he or she is disabled within the meaning of the policy. *Orndorf, 404 F.3d at 518; Boardman, 337 F.3d at 17; Brigham, 317 F.3d at 84-85* ("As claimant, Brigham needed to demonstrate his entitlement to benefits, and he therefore had the burden of substantiating the doctors' new diagnosis that he was incapable of performing fully sedentary work.") Liberty denied the Plaintiff's application for LTD because she did not meet the definition of disability, which requires claimants to prove (1) that he or she "is unable to perform the Material and Substantial Duties of his Own Occupation" and (2) that this limitation is the "result of Injury or Sickness". Cf. *Boardman, 337 F.3d at 16.* As in

Boardman, Liberty's LTD denial letters reveal that it denied the Plaintiff's claim because she failed to establish the first prong -- that her sickness severely impairs her ability to perform her own occupational job duties as customarily performed. Id. Throughout Liberty's [*64] review, Nurse Kaye focused on whether the evidence demonstrated a change in the Plaintiff's condition such that she could no longer perform her occupation as she had despite suffering from self-reported fibromyalgia symptoms since at least 1996. Although Dr. Schur and Dr. Bomalaski questioned the diagnosis of fibromyalgia by Dr. Malanoski and Dr. Goodman, suggesting other tests should be performed to rule out other causes, Liberty seems to have been "willing to accept, for the purpose of determining whether [the Plaintiff] met the definition of [] Disability, that she satisfied" the sick or injured requirement. Id. Furthermore, Dr. Schur opined that even if she did not have fibromyalgia, she likely suffered from another disabling rheumatoid condition, and Dr. Bomalaski seemed to agree that she is suffering from at least some impairment. Liberty conceded in argument of these motions that the Plaintiff suffers from fibromyalgia. Thus, the issue in this action is not the etiology of the Plaintiff's condition, but whether it affected "her capacity for gainful employment" and more specifically, whether or not her sickness precludes her from being able to perform the material and [*65] substantial duties of her own occupation. Cf. *Orndorf, 404 F.3d at 526* ("This case turns not on the question whether plaintiff suffered back, ankle, or neck pain. The medical reports clearly show back problems and the patient's reports of back pain over time. This case turns on whether he met his burden of showing that this backpain disabled him from performing his job.") As Judge Posner has observed, "some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether [the claimant] is one of the minority." *Sarchet, 78 F.3d at 307* (internal citation omitted).

Before reviewing the evidence with this focus, I note that Dr. Miller, Dr. Bomalaski and Dr. Schur all suggested modifications of her treatment regime that might improve her situation. Liberty did not require the Plaintiff to follow-up on the alternative diagnoses and treatments, nor did the Plaintiff do so on her own initiative, at least as reflected in the administrative record. Under the Disability Policy, Liberty can require ongoing proof of a claimant's continued "disability, regular attendance of a physician; and [*66] appropriate available treatment." Presumably, the latter requirement means proof of continued use of appropriate available treatment. However, since Liberty did not deny the LTD benefits because she was not using the appropriate

available treatment, I must decide whether the evidence before Liberty was sufficient for it reasonably to decide that the Plaintiff's current condition, even without trying treatment regimes that might improve her situation, did not preclude her from being able to perform the material and substantial duties of her own occupation.

The evidence on the Plaintiff's physical abilities, restrictions and limitations can be summarized as follows.

. Dr. Malanoski, the Plaintiff's initial treating physician, concluded, without any explanatory remarks, that her physical impairment due to fibromyalgia was Class 5, meaning "severe limitation of functional capacity; incapable of minimum activity";

. Dr. Goodman, her treating rheumatologist, concluded that "recently her symptoms of fatigue, exhaustion, myalgia and insomnia had worsened. These symptoms appear to have been quite marked over the last year or so, such that she is unable to perform her usual work [*67] as a quality control group leader" as "this work requires her to be on her feet all day." He also opined that her medications "afford her some relief of her symptoms but she remains totally disabled in terms of her line of work. She is unable to perform this work as she is unable to be on her feet for the amount of time it takes to perform her job adequately. She is also disabled by exhaustion and myalgia which makes it difficult for her to stay at work for any appreciable amount of time.";

. Dr. Miller, the physiatrist who conducted the first peer review, concluded that "there are no documented objective physical exam findings that support a decrease or significant change in this patient's physical condition." "The documentation provided does not indicate a significant change in the patient's condition about the time of disability 10/03/2001 because there are no objective physical function deficits documented and the patient had a normal cardiac exercise test.";

. Dr. Schur, a rheumatologist who

performed an IME, concluded that "at least for the time being, she is clearly disabled not only from work, but being able to take care of her household . . . For now, until [modifications [*68] of her regime improve her stamina], which may take months, she is clearly disabled.";

. Dr. Bomalaski concluded that the "clinical medical evidence does not clearly support severe impairment because . . . the diagnosis of fibromyalgia remains in question." He also concluded that the Plaintiff "is capable of working full time in a primarily sedentary position within the limitations and restrictions noted on the Functional Capacities Form."; and

. Nurse Kaye repeatedly stated that her "review does not [yield] new medical information to alter previous findings that [there was no] significant change in [claimant]'s condition" around the date of disability "to substantiate [restrictions/limitations] during the elimination period." She pointed out that the Plaintiff's "occasional flares . . . have responded to physical therapy" and questioned whether the Plaintiff "may be self-limiting her work or social activities".

. Surveillance evidence observing the Plaintiff doing errands for just over three hours in one day, which included "walking and moving in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties. [*69] " On the other days, the investigator did not observe any activity out of her house except one errand, although the Plaintiff did not appear to be home on the morning of the 2nd.

. The Plaintiff's Activities Questionnaire from July. 23, 2002.

Before considering this evidence, I must emphasize a few preliminary observations. First, under the arbitrary and capricious standard of review, "evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Wright, 402 F.3d at 74* (internal citations and quotations omitted). Second, Liberty is not precluded

from relying on the assessment of a non-examining physician, rather than the Plaintiff's treating physician. *Black & Decker, 538 U.S. at 834; Gannon, 360 F.3d at 214.* Third, I decline to discredit the opinions of any of the doctors or of Nurse Kaye because they would not qualify as "expert witnesses" at trial under the well-established *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)* and *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* test. The Plaintiff [*70] fails to cite any relevant authority on this point.

The evidence Liberty considered that supported the Plaintiff's position was the Plaintiff's own self-reported Activities Questionnaire and the opinions of Dr. Malanoski, Dr. Goodman and Dr. Schur. This evidence has its limitations, as pointed out by Nurse Kaye in her review. The evidence Liberty considered that supported the denial were the opinions of Dr. Miller, Dr. Bomalaski and Nurse Kaye and the surveillance report. I review the surveillance evidence and these opinions to determine whether Liberty's decision was reasoned and supported by substantial evidence despite the contradictory opinions of Dr. Schur, Dr. Goodman and Dr. Malanoski.

1. Surveillance Evidence -- In this action, the Defendants argue that the surveillance evidence from October 2002 "fatally undermines" the Plaintiff's credibility by contradicting her self-reported limitations in the July 23, 2002 Activities Questionnaire and those reported to Dr. Schur in April 2002. In the Activities Questionnaire completed less than three months before the surveillance, the Plaintiff indicated that she needed assistance to go grocery shopping and to carry groceries, [*71] that she can only sit in a car for 20 min, that she can only drive a car for 5 min, that she can only stand 10 min at a time and walk 10-15 min at a time, and that she only stands 30 min a day and walks 20 -- 20 min a day. It is true that the life described by these responses is inconsistent with running errands for just over three hours, including grocery shopping for more than an hour where the investigator observed her "walking and moving in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties." On the other hand, the Plaintiff did indicate that she made trips to the local drug store if needed and that she usually left the house one day a week and once on the weekend. Moreover, the Defendants' argument as to this issue overstates Liberty's apparent reliance on indications of contradictions during the administrative process. While Nurse Kaye noted that the surveillance found her to be "very active", neither she nor Liberty in its final December 2002 denial letter made reference to these

contradictions. Rather, Liberty simply concluded that "no restrictions and limitation[s] were noted throughout" the surveillance. [*72] In any event, I do not find evidence essentially showing one three-hour excursion for errands on an isolated day, to be particularly substantial with respect to her ability to work an eight-hour day.

2. Dr. Miller's Report -- As discussed in Section II.b.2.e supra, in answering Nurse Kaye's referral question, Dr. Miller found the notes of Dr. Goodman and Dr. Malanoski that he reviewed did not reveal any "objective physical exam findings that support a decrease or significant change in this patient's physical condition." The Plaintiff's strongest argument is that Nurse Kaye's referral question, Dr. Malanoski's answer and Liberty's fixation on the fact that she was diagnosed with fibromyalgia, yet worked for many years before finally applying for disability benefits, is unreasonable given the nature of her condition. For support the Plaintiff looks to *Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914 (7th Cir. 2003)*, where Judge Posner found Prudential's fixation on objective proof of change in condition led to an unreasonable denial. With respect to the idea of proof of change, Judge Posner explained:

> The plan's bad argument is [*73] that because [the claimant] worked between 1993 and 2000 despite his fibromyalgia and there is no indication that his condition worsened over this period, he cannot be disabled. This would be correct were there a logical incompatibility between working full time and being disabled from working full time, but there is not. A desperate person might force himself to work despite an illness that everyone agreed was totally disabling. Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely. [The claimant] may have forced himself to continue in his job for years despite severe pain and fatigue and finally have found it too much and given it up even though his condition had not worsened. A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working.
>
> . . .
>
> But what is most important and ties back

to the plan's bad argument is that [the claimant's] unfortunate choice in life is between succumbing to his pain and fatigue and becoming inert, on the one hand, and on the other hand pushing himself to engage in a certain amount of painful and [*74] fatiguing activity. If he does the latter, it does not prove that he is not disabled.

*Hawkins, 326 F.3d 914 at 918* (internal citations omitted). With respect to the need for objective proof of disability, Judge Posner explained:

> The gravest problem with [the consulting doctor] s report is the weight he places on the difference between subjective and objective evidence of pain. Pain often and in the case of fibromyalgia cannot be detected by laboratory tests. The disease itself can be diagnosed more or less objectively by the 18-point test (although a canny patient could pretend to be feeling pain when palpated at the 18 locations -- but remember that the accuracy of the diagnosis of [the claimant]' fibromyalgia is not questioned), but the amount of pain and fatigue that a particular case of it produces cannot be. "It is "subjective" -- and [the consulting doctor] seems to believe, erroneously because it would mean that fibromyalgia could never be shown to be totally disabling, which the plan does not argue, that because it is subjective [the claimant] is not disabled.

*Id. at 918-19.*

I find that while Judge Posner's [*75] second point is compelling, I am bound by First Circuit precedent that approved denial of benefits where the administrator concluded that "none of the specialists that have treated [the claimant] in the past two years have indicated any limitations or restrictions, based on objective findings that would preclude [the claimant] from performing any occupation for which she is suited. Therefore, we have determined that [the claimant] does not meet the definition of disability as required by the policy." *Boardman, 337 F.3d at 16-17*. Quite apart from the Plaintiff's burden of proving restrictions and limitations based on objective findings that would preclude her from

performing her own occupation, the difficulty with Dr. Miller's opinion and Liberty's corresponding focus, as suggested by Judge Posner's first point, is that they draw the conclusion that she is not disabled because she has worked for many years without an objective change in her condition. n18 The reason I will not discount Dr. Miller's opinion, as Judge Posner did in the opinion in Hawkins, is that the Plaintiff herself claims that her symptoms worsened to the point where she could no longer work [*76] in October 2001. Thus, under controlling First Circuit precedent, Liberty may reasonably consider the lack of objective evidence to substantiate the Plaintiff's self-reported worsening. *Boardman, 337 F.3d at 16-17; Brigham, 317 F.3d at 84-85* ("As claimant, Brigham needed to demonstrate his entitlement to benefits, and he therefore had the burden of substantiating the doctors' new diagnosis that he was [no longer capable] of performing fully sedentary work.")

n18 In contrast to Hawkins, I note that in Orndorf, the First Circuit considered the fact that the claimant had "actually worked" in his occupation "without any physical limitations despite twenty years of back pain and treatment" as one of the pieces of evidence showing that the claimant did not meet the definition of disability. In that case, the First Circuit also pointed out that "even as late as [14 months before he stopped working], [the claimant] complained to a doctor of long-standing' low back pain, yet he continued to perform his job for another 14 months without any physical limitations or claims of disability." *Orndorf, 404 F.3d at 526.*

[*77]

3. Dr. Bomalaski's Report -- I review Dr. Bomalaski's report more carefully because of the conflict of interest inference I am drawing against Liberty. See Section II.b.1 supra.

After reviewing the surveillance evidence and the Plaintiff's medical records, Dr. Bomalaski concluded that the "clinical medical evidence does not clearly support severe impairment because as noted the diagnosis of fibromyalgia remains in question not only by this reviewer but as also by Dr. Schur." He also concluded that the Plaintiff "is capable of working full time in a primarily sedentary position within the limitations and restrictions noted on the Functional Capacities Form." These comments have limited probative value, but I will not go so far as to describe Dr. Bomalaski's report as suffering from "fundamental flaws". Cf. *Buffonge v.*

*Prudential Ins. Co. of America, 426 F.3d 20, 29 (1st Cir. 2005)* (where the reviewing doctor concluded that "a consensus exists" that the claimant could perform a desk job, even though there were at least three recent reports concluding the opposite).

The first comment is ambiguous at best. If Dr. Bomalaski intended his comment to mean [*78] that "the clinical medical evidence does not clearly support a [severely impairing medical illness or condition]", then the comment is consistent with the evidence given the doubts Dr. Schur raised about the fibromyalgia diagnosis. See Section II.b.2.b supra. If Dr. Bomalaski meant that "the clinical medical evidence does not clearly support a severe [physical] impairment" because the diagnosis is in doubt, then the comment ignores the possibility suggested by Dr. Schur that the Plaintiff might be suffering from some other rheumatoid condition, but is disabled nonetheless. In any event, the first comment is neither a material mischaracterization as in Buffonge, nor a strong piece of evidence supporting Liberty's decision.

In contrast, the second comment has the potential to support Liberty's decision, but lacks sufficient evidentiary foundation. The first issue raised by the Plaintiff is the reasonableness of Liberty's use, and Dr. Bomalaski reliance upon, the labor market survey and vocational review completed in November 2002, instead of just GenRad's job description for Group Leader -- Manufacturing and/or the DOT description for Inspection Group Leader, Printed [*79] Circuit Board Quality Control. I decline to reproach Liberty for its use, and Dr. Bomalaski's reliance upon, the labor market survey and vocational review because the Disability Policy charged Liberty with determining whether the Plaintiff's disability prevented her from performing "the material and substantial duties of [her] own occupation" "as it is normally performed in the national economy." Furthermore, the vocational case manager who provided the DOT description emphasized that it is a "basic description without input from a vocational professional. If a claim determination is being considered on the basis of this information, [the] Disability Case Manager should consider a referral for a complete Vocational Case Manager file review and to determine if further investigation, including, but not limited to, a Labor Market Survey is needed."

In any event, the difference between the three occupational documents is quite minimal. Based on the labor market survey, the vocational consultant found that the physical demands would be considered sedentary to light with occasional lifting up to 20 lbs. The other two documents list very similar physical requirements with respect to [*80] lifting, except that GenRad's description

lists occasional lifting up to 25 lbs and the DOT description lists "Strength: Light -- Lifting, Carrying, Pushing, Pulling 20 Lbs. occasionally, frequently up to 10 Lbs., or negligible amount constantly." I find the debate about what weight the Plaintiff might need to lift occasionally to be for the most part irrelevant and to miss the point. The only doctor that made any reference to whether the Plaintiff could do the lifting required by her occupation was Dr. Bomalaski. Neither Dr. Goodman nor Dr. Schur mentioned her inability to lift certain weights as part of the reason she is disabled from work. Focusing on the weight element, ignores the true issue over which Dr. Goodman, Dr. Schur and Dr. Bomalaski disagree, namely can the Plaintiff work full-time in her occupation despite general fatigue and muscle pain symptoms?

The amount of standing, sitting and walking is more relevant to this question, although the real question at bottom is whether or not she can do anything for eight hours. GenRad's job description said nothing about whether the Group Leader -- Manufacturing Inspection position requires employees to stand for long periods of [*81] time or whether the position was primarily sedentary. The DOT description suggested that the responsibilities for Group Leaders for Printed Circuit Board Quality Control "can include walking and or standing frequently even though weight is negligible." The vocational consultant's report is even more specific: "the physical demands would be considered sedentary to light work with occasional standing, walking and bending. The opportunity to intermittently change positions from sitting to standing and walking is typically provided during the course of the workday." Thus, I find that it was reasonable for Dr. Bomalaski to focus on whether the medical reports and the other evidence before him indicated whether or not the Plaintiff could function "primarily in a sedentary environment."

The second issue is whether Dr. Bomalaski's answer to that inquiry is reasonable under a heightened standard of review. Dr. Bomalaski admitted in his report that "limitations of ability to function are difficult to assess related to Ms. Denmark's impairment[.]" Yet, he found that she could function in a primarily sedentary environment for an eight hour work day, subject to the functional limitations and [*82] physical restrictions listed in the Functional Capacities Form. The only evidence he cites to support his evaluation is the surveillance evidence. The Plaintiff's three-hour errand run, which included grocery shopping -- and therefore walking, standing, lifting and pushing -- for more than an hour could reasonably support his conclusions regarding her ability to do occasionally many of the activities identified by the action verbs listed. What this evidence does not reveal is whether or not she can perform her

duties for a full work day on an ongoing basis. The only evidence on this point in the file is the Plaintiff's own Activities Questionnaire, Dr. Goodman's uncorroborated conclusion that "she is also disabled by exhaustion and myalgia which makes it difficult for her to stay at work for any appreciable amount of time", and one interpretation of Dr. Schur's opinion, namely that she is disabled from work and taking care of her household because of stamina and deconditioning issues. Even though neither Dr. Goodman nor Dr. Schur point to objective evidence' supporting their opinions about the Plaintiff's ability to perform her duties for a full work day on an ongoing basis, this [*83] limitation undermines Dr. Bomalaski's conclusion.

4. Nurse Kaye's Analysis -- To evaluate the Plaintiff's STD and LTD claims, Nurse Kaye, a Liberty Disability Case Manager, reviewed her medical records and sought additional opinions. I evaluate the reasonableness of her analysis of the evidence favorable to the Plaintiff and her recommendations.

Nurse Kaye found Dr. Goodman's assertion that the Plaintiff is "unable to stand for long duration at work" to be "not supported by the physical job demands of her job." She also found that his report did not support the Plaintiff's restrictions and limitations and requested a peer review "to fully define" the Plaintiff's condition and to "determine if [the restrictions/limitations] are supported." These remarks are reasonable for the reasons discussed in the preceding sub-section.

With respect to Dr. Schur's opinion, Nurse Kaye found that it is limited in scope because his "inferences into the status of [the Plaintiff's] conditions 6 months previous cannot be accurately assessed." She explains that the Plaintiff "is noted to be severely deconditioned as of 4/02, most likely as a result of interrupted functional activities, & [*84] this could certainly have affected Dr. Schur's assessment. His conclusion that [the Plaintiff] is on excessive cardiac medications, with unclear indications, may be an additional contributing factor to [the Plaintiff]'s reports of fatigue. . . . [The Plaintiff] may be self-limiting her work or social activities, with no objective medical basis to support [restrictions/limitations] from 10/3/01 -- 4/12/02." Contrary to the Plaintiff's suggestions, I find that questioning the probative value of Dr. Schur's opinion because his "inferences into the status of [the Plaintiff's] conditions 6 months previous cannot be accurately assessed" is a reasonable determination when read in the context of her explanation for the statement. Thus, Nurse Kaye's analysis disputes Dr. Schur's conclusion that the Plaintiff cannot perform the material and substantial duties of her own occupation.

5. Conclusion -- The administrative record here contains conflicting medical opinions about the degree of the Plaintiff's restrictions and limitations. On the one hand, there is Dr. Goodman's conclusion that the Plaintiff "is also disabled by exhaustion and myalgia which makes it difficult for her [*85] to stay at work for any appreciable amount of time." This conclusion, although "unelaborated", see *Brigham, 317 F.3d at 84*, remains unchallenged in the administrative record. On the other hand, there are reasons in the record discussed above that support Liberty's doubts with respect to the Plaintiff's self-reported limitations, Dr. Schur's opinion that she is disabled from work, and Dr. Goodman's opinion that "she is unable to perform this work as she is unable to be on her feet for the amount of time it takes to perform her job adequately." Furthermore, there is Dr. Miller's uncontradicted opinion that "there are no documented objective physical exam findings that support a decrease or significant change in this patient's physical condition" around the date of disability and Dr. Bomalaski's not fully supported, although still relevant, opinion that the Plaintiff "is capable of working full time in a primarily sedentary position within the limitations and restrictions noted on the Functional Capacities Form."

To draw a conclusion from this record, I turn to the words in Boardman. "Throughout the administrative process, [Liberty] advised [the Plaintiff] of [*86] her failure to show how her illness rendered her unable to work, and informed her of her right to submit additional evidence and documentation that she wished to have considered. [] [The Plaintiff]'s submissions on appeal consisted primarily of arguments based on existing documentation, with scant attention to her burden of showing that, due to her illness, she was unable to perform the duties of her own . . . occupation. Given (1) the absence of adequate evidence in [the Plaintiff]'s medical records indicating that [the Plaintiff]'s condition imposed limitations on her ability to perform the material and substantial duties of her own occupation . . . occupation for which she is suited, and (2) the evidence to the contrary provided in [the surveillance evidence, the reports of Dr. Miller and Dr. Bomalaski, and Nurse Kaye's analysis], [Liberty]'s determination that [the Plaintiff] failed to meet the definition of . . . Disability was not arbitrary or capricious." *Boardman, 337 F.3d at 17.*

## III. CONCLUSION

For the reasons set forth more fully above, I GRANT the Plaintiff's Motion to Complete the Record on Review as to Exhibits A and C, I DENY the [*87] Defendants' Motion to Strike, I DENY the Plaintiff's Motion for Summary Judgment, and I GRANT the Defendants' Motion for Summary Judgment.

DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT JUDGE