# Exhibit H

2002 U.S. Dist. LEXIS 12380, *; 28 Employee Benefits Cas. (BNA) 2126

2 of 3 DOCUMENTS

**JOYCE DiGIOVANNI, Plaintiff v. THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Defendant**

**CIVIL ACTION NO. 98-10908-GAO**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2002 U.S. Dist. LEXIS 12380; 28 Employee Benefits Cas. (BNA) 2126*

**June 28, 2002, Decided**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted in part. Judgment entered in defendant's favor. Judgment entered for Plaintiff on count III. No attorneys' fees awarded to either party.

**COUNSEL:** For JOYCE DIGIOVANNI, Plaintiff: John F. Danehey, Murray & Murray, Boston, MA.

For JOYCE DIGIOVANNI, Plaintiff: Edward M. Cronin, Cambridge, MA.

For THE GUARDIAN LIFE COMPANY OF AMERICA, INC., Defendant: Joseph F. Ryan, Lyne, Woodworth & Evarts, Boston, MA.

**JUDGES:** GEORGE A. O'TOOLE, JR., DISTRICT JUDGE.

**OPINIONBY:** GEORGE A. O'TOOLE, JR.

**OPINION:**

### MEMORANDUM AND ORDER

June 28, 2002

O'TOOLE, D.J.

The plaintiff, Joyce DiGiovanni, alleges that the defendant, The Guardian Life Insurance Company of America ("Guardian"), her former employer and insurer, denied her total disability benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. §§ 1001* et seq., (Counts I and IV, and V) n1, that Guardian failed to administer [*2] the plan with the care, skill, prudence and diligence required by *29 U.S.C. § 1104*(a)(1)(B) (Count II), and that Guardian did not give timely notice of the opportunity for continued health care coverage in violation of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), *29 U.S.C. § 1161* et seq. (Count III). Guardian counterclaimed seeking repayment of amounts it advanced to DiGiovanni that are offset by her receipt of Social Security benefits. Guardian has moved for summary judgment on all claims (Docket No. 34). The motion is GRANTED as to Counts I, II, IV, and V and as to Guardian's counterclaim. On the other hand, on the undisputed facts judgment shall enter for DiGiovanni on Count III.

n1 Count I seeks damages pursuant to *29 U.S.C. § 1132*(a)(1)(B). Count IV seeks a declaratory judgment pursuant to *29 U.S.C. § 1132* (a)(3)(B). Count V seeks an injunction pursuant to § 1132(a)(3)(A).

### I. Background [*3]

In December 1987, Guardian hired DiGiovanni as a medical claims analyst in its Norwell, Massachusetts office. Compl. P 11; DiGiovanni Aff. P 10. DiGiovanni was approximately 34 years old; prior to accepting the position, she had been a housewife. DiGiovanni Aff. PP 29, 30. The parties dispute her exact job description, but the plaintiff claims that her primary duty was to enter data into a computer "eight hours a day, five days a week" and that her pay was based on the amount of information she processed. DiGiovanni Aff. PP 15, 16. Guardian offers a written job description for DiGiovanni's position, group claims approver, indicating that her duties included, but were not limited to, reviewing and approving claims for payment or denial, evaluating questionable claims, and referring claims to a

Case 1:03-cv-12389-GAO     Document 28-38     Filed 02/08/2006     Page 3 of 8

Page 3
2002 U.S. Dist. LEXIS 12380, *; 28 Employee Benefits Cas. (BNA) 2126

senior approver or supervisor. n2 The job description states that the position requires a high school diploma or equivalent work experience and math and communications skills. Ryan Aff. Ex. D at 2015. DiGiovanni has a general education degree ("GED") and no other pertinent training or work experience. DiGiovanni Aff. PP 25, 27.

> n2 The job description states that the "statement of duties is for the purpose of identifying the position. It does not cover in detail all of the duties required of the position." Ryan Aff. Ex. D, note at 2015

[*4]

In April 1991, DiGiovanni fell down some stairs near the front of Guardian's Norwell office and severely injured her left hand. Compl. P 14. She subsequently had four surgeries, underwent approximately thirteen nerve blocks, and had a spinal cord stimulation device installed in her back to treat the injury. DiGiovanni Aff. P 1.

While employed at Guardian, DiGiovanni qualified as a beneficiary under Guardian's Group Life Insurance Policy ("the Policy"), which provided short and long term disability benefits. Compl. Ex. A. Between April 1991 and April 1994, DiGiovanni was periodically in and out of work due to various surgeries and treatments, and she received short term disability benefits under the Policy accordingly. DiGiovanni Aff. P 2. DiGiovanni never returned to work after March 1993. Compl. P 15. In April 1994, Guardian approved long term disability benefits for DiGiovanni and continued those benefits until June 1997. Compl. P 18; Ex. B. In a letter dated June 30, 1997, Guardian informed DiGiovanni that after reviewing the results of her independent medical evaluation it found that she was no longer eligible for long term disability benefits because she was not "totally disabled" [*5] as that term is defined by the Policy. Ryan Aff. Ex. 7. DiGiovanni appealed the termination of her benefits, but after review, Guardian affirmed the termination. Ryan Aff. Ex. 8. Subsequently DiGiovanni submitted medical reports from two additional doctors and requested a re-evaluation of her claim in light of these reports. Her request prompted Guardian to arrange another independent medical examination and seek two additional expert opinions. On December 11, 1997, Guardian found that its further investigation affirmed the initial decision that DiGiovanni was not "totally disabled" as the term is defined by the Policy. Ryan Aff. Ex. 14.

The Policy

The Policy provides that it might "be amended at any time, without the consent of the Employees insured hereunder . . . but any such amendment shall be without prejudice to any claims arising prior to the date of the change." Compl. Ex. A, Part VI, § 6 at 12. Guardian revised and reissued the Policy effective as of December 31, 1994. Ryan Aff. Ex. 3. Guardian argues that the revised policy should govern the termination of DiGiovanni's benefits, which occurred in 1997. Compl. Ex. C. Significantly, the revised [*6] policy provides (while the earlier one did not) that "Guardian is the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims." Ryan Aff. Ex. 3 at 22. This explicit grant of discretionary authority potentially allows the administrator's decisions to be reviewed under the deferential arbitrary and capricious standard. See *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989)*. The pre-1994 policy does not provide such discretion and thus the Court's review of an administrator's decision under that policy would be de novo. Since DiGiovanni first became eligible for long term disability benefits in 1994 and since the revised policy might be thought to be prejudicial to DiGiovanni in the sense that it made it harder for an employee successfully to challenge benefits decisions under a more deferential standard of review, the Court will assess the claim under the provisions of the pre-1994 policy. Moreover, DiGiovanni claims that the policy attached to the Complaint as Exhibit A, the pre-1994 policy, is the policy Guardian sent her in response to [*7] her written request for a copy of the controlling policy. See Ryan Aff. Ex. 10 at 167, 175. Guardian ought not to be heard to argue otherwise now.

## II. Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)*.

A denial of benefits, "challenged under *29 U.S.C. § 1132(a)(1)(B)* is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone, 489 U.S. at 115*. On the other hand, if a policy

Case 1:03-cv-12389-GAO    Document 28-38    Filed 02/08/2006    Page 4 of 8

Page 4

2002 U.S. Dist. LEXIS 12380, *; 28 Employee Benefits Cas. (BNA) 2126

provides the administrator with discretionary authority, an arbitrary and capricious standard of review [*8] applies to the administrator's factual determinations. See *Diaz v. Seafarers Int'l Union, 13 F.3d 454, 456 (1st Cir. 1994); Grady v. Paul Revere Life Ins. Co., 10 F. Supp. 2d 100 (D. R.I.1998); Guarino v. Metro. Life Ins. Co., 915 F. Supp. 435 (D. Mass. 1995).* A benefits plan "must clearly grant discretionary authority to the administrator before decisions will be accorded the deferential, arbitrary and capricious, standard of review." *Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 583 (1st Cir. 1993)* (holding de novo standard of review appropriate where delegated discretionary authority was unclear). While particular "magic words" are not necessary to find discretionary authority, "explicit language" is required. *Allen v. Adage, Inc., 967 F.2d 695, 697-98 (1st Cir. 1992); Kiley v. Travelers Indem. Co., 853 F. Supp. 6, 10 (D. Mass. 1994); Coleman v. Metro. Life Ins. Co., 919 F. Supp. 573, 580 (D.R.I. 1996)* (finding discretionary authority in a plan that gave its administrator the power "to interpret and construe the Plan, [and] to determine all questions of [*9] eligibility and the status and rights of Participants" and that provided that all decisions of the administrator "shall, to the extent not inconsistent with the provisions of the Plan, be final and conclusive and binding upon all persons having an interest in the Plan") (internal citations omitted) (quoting *Block v. Pitney Bowes, Inc., 293 U.S. App. D.C. 256, 952 F.2d 1450, 1452-53 (D.C. Cir. 1992)).*

The pre-1994 Guardian policy does not explicitly provide discretionary authority to the plan administrator; it merely articulates the mechanics required for the application and receipt of benefits under the plan. n3 The Guardian policy is very like the policy interpreted in *Grady, 10 F. Supp. 2d at 100,* which required the claimant to submit proof of claim, proof of loss, and written proof of entitlement, and to give the insurer the right to request additional information and to order an independent medical exam. The Grady court found that such policy provisions were "simply garden-variety contract terms specifying the procedure by which claims are to be processed, and by which the Policy is to be administered. It would require a logical leap of Olympic [*10] proportions to find that these provisions give defendant the last word in interpreting the contract, or in determining eligibility for benefits." *Grady, 10 F. Supp. 2d at 110.* Similarly, the Guardian policy does not sufficiently provide the administrator with the discretionary authority necessary to trigger the arbitrary and capricious standard, and the Court will review the termination of DiGiovanni's benefits de novo.

n3 Part VII, entitled "Claim Provisions" provides that "written proof of loss must be furnished to the Insurance Company within 30 days after the commencement of the period for which the Insurance Company is liable. Subsequent written proofs of the continuance of such disability must be furnished to the Insurance Company at such intervals as the Insurance Company may reasonably require," that the "Insurance Company shall have the right and opportunity to examine the person whose injury or sickness is the basis of claim when and so often as it may reasonably require during pendency of claim hereunder," and that "subject to due proof of loss, all benefits for loss of time will be paid not later than at the expiration of each period of thirty days during the continuance of the period for which the Insurance Company is liable . . . ." Compl. Ex. A § § 1(B), 1(E), 2(A) at 14.

[*11]

## III. Discussion

### A. ERISA Claims

In Count I, DiGiovanni seeks to recover her long term disability benefits pursuant to *29 U.S.C. § 1132*(a)(1). The parties do not dispute the facts material to the determination that DiGiovanni is no longer "totally disabled" as that term is defined in the Policy.

The Policy provides short term disability benefits in accordance with the length of the insured's employment (Plan A) and long term disability benefits for an insured who becomes totally disabled (Plan B). Compl. Ex. A., Part III, at 6; Part IV, at 8. Under the Policy, the term "total disability"

"means the complete inability of the Employee to perform any and every duty pertaining to [her] occupation, except that if benefits have been paid under either Plan A or Plan B of this Policy for twenty-four months of any continuous period of disability, then for the balance of the period of disability, Total Disability shall mean complete inability of the Employee to engage in any reasonably gainful occupation for which he is or may become fitted by education, training or experience, having due regard for the nature of the Employee's occupation at [*12] the time

Case 1:03-cv-12389-GAO     Document 28-38     Filed 02/08/2006     Page 5 of 8

Page 5

2002 U.S. Dist. LEXIS 12380, *; 28 Employee Benefits Cas. (BNA) 2126

[she] became disabled and for [her] prior average earnings."

Ryan Aff. Ex. A, Part II, at 5. Prior to becoming disabled, DiGiovanni performed clerical duties and earned an annual income of approximately $ 29,900. DiGiovanni Aff. P 32. Therefore, the standard for determining whether DiGiovanni was totally disabled in 1997 is not whether she could return to a position that required her to type for eight hours a day, but whether she could engage in any position fit for a person with a GED, earning almost $ 30,000 per year, with approximately four years of clerical experience. The record of undisputed facts supports the conclusion that in June 1997, DiGiovanni was not "totally disabled" as that term is defined by the Policy.

In December 1994, Dr. Richard Greenberg conducted an independent medical examination of DiGiovanni. He predicted that DiGiovanni would have "permanent, partial disability due to discomfort in the thumb. It should be in the region of 10% of her thumb function which is approximately 2% of hand function and perhaps 1% of total body function . . . . She is expected to be able to return to the marketplace in full capacity as long as she doesn't have [*13] to use her left hand." Ryan Aff. Ex. 2 at 249.

In March 1997, DiGiovanni's attending physician, Dr. James Doyle, found that DiGiovanni was "unable to perform the material duties of his/her occupation with reasonable continuity" explaining that "the repetitive motion of the keyboard flares up the hand pain." Ryan Aff. Ex. 4 at 237. Dr. Doyle made no finding as to DiGiovanni's ability to engage in any reasonable and appropriate occupation that did not involve repeated use of a keyboard.

In April 1997, Guardian hired an outside company to interview DiGiovanni. Ryan Aff. Ex. 5 at 230. During the interview, DiGiovanni stated that she does "household chores and some limited gardening." She also stated that she "drives and does local errands." Ryan Aff. Ex. 5 at 231. DiGiovanni claimed that the injury to her left thumb prevented her "from performing a full range of daily activities." Ryan Aff. Ex. 5 at 231. The report from this interview prompted Guardian to request an independent medical examination by Dr. Barry Simmons. Ryan Aff. Ex. C at 218. On June 16, 1997, Dr. Simmons reported that

despite the fact that she has persistent pain, she certainly doesn't present the

picture of [*14] a patient with a chronic pain problem . . . . It would certainly seem at this time that she can return to work. There is no doubt that she can return to full-time employment using her right hand predominantly. She could use her left hand as an assistive hand, as long as there is no lifting of more than 2 or 3 pounds and as long as she doesn't have to do multiple repetitive motions for more than 5 or 10 minutes every hour. Another alternative would be to have her return to a full, part-time job in which she works only 4 hours a day. In that situation, I think she could not necessarily do any more heavy lifting than she would in a full day, but she might be able to do longer periods of repetitive motion, such as keyboard work or filing.

Ryan Aff. Ex. 6 at 21. Following the receipt of this report, Guardian terminated DiGiovanni's long term disability benefits stating only that she was no longer "totally disabled" as that term is defined in the Policy. Ryan Aff. Ex. 7 at 188.

After Guardian denied her initial appeal, DiGiovanni submitted additional reports from Dr. Leonard Ruby and Dr. James Doyle and requested that Guardian reconsider the termination of her long term benefits. [*15] Ryan Aff. Exs. 9, 10. Dr. Ruby had begun treating DiGiovanni around early 1992. He reported that when he last saw her on July 14, 1997 (after Guardian's letter terminating her benefits), he agreed to refer her to the Pain Management Center because she could not sleep at night due to the pain and was taking prescription painkillers. Ryan Aff. Ex. 9 at 96. Dr. Doyle reported that DiGiovanni's acupuncture treatments provided some pain relief such that she could "sleep comfortably without the need for propping the arm" and that she "takes medication . . . at a lower frequency." Ryan Aff. Ex. 10 at 119. Dr. Doyle also stated that DiGiovanni uses "her left hand for activities of daily living, although it does produce more pain to do so. Pain is present most of the time, and the use of the hand for hobbies is too pain-inducing." Id. He concluded that DiGiovanni was "disabled from work involving the use of both hands," implying that she was capable of work involving the use of her right hand. Id.

These reports prompted Guardian to request another independent medical examination of DiGiovanni, this time by Dr. Hillel D. Skoff. Ryan Aff. Ex. 6 at 51. Dr. Skoff reported that DiGiovanni [*16] was a right-handed woman who stated that she was formerly a "claims

Case 1:03-cv-12389-GAO    Document 28-38    Filed 02/08/2006    Page 6 of 8

Page 6

2002 U.S. Dist. LEXIS 12380, *; 28 Employee Benefits Cas. (BNA) 2126

appraiser" at Guardian and that her duties "required the use of phones, typing, writing and all manner of repetitive manual skills." Ryan Aff. Ex. 11 at 10. Dr. Skoff rated DiGiovanni's impairment "in accordance with AMA Guidelines" to be 10% of her upper extremity and 6% of her whole person. Ryan Aff. Ex. 11 at 11. Dr. Skoff's review of the "medical facts" in the case led him to conclude that DiGiovanni was "capable of some degree of work based upon her use of her right dominant and upper extremity and some capability in the left upper extremity despite the minor causalgia." He further stated that "repetitive two-handed typing for prolonged periods will [not] be possible, but certainly phone work, writing and a very limited degree of typing should be possible." Ryan Aff. Ex. 11 at 11.

DiGiovanni argues that Guardian's termination of her long term benefits was based on the allegedly erroneous conclusion that she could return to the same position that she held within Guardian at the time she became disabled. She claims that because Guardian did not have an accurate description of duties prior to her disability it [*17] was not able to determine the type of position for which she would be "fitted by education, training, or experience." Compl. Ex. A, Part II, at 5. DiGiovanni claims that an assertion in a letter from Guardian dated August 11, 1997, which affirms the termination of her benefits and the deposition testimony of Kettly E. Philippe, a claims analyst who was designated by Guardian as the most knowledgeable witness for purposes of *Fed. R. Civ. P. 30(b)(6)*, support this argument. In the letter Guardian states that "as her employer, we are very familiar with the major duties of her own occupation and other occupations that would be suitable. We have concluded that she can perform the material duties of a suitable occupation. In fact, she is capable of performing the material duties of her occupation as a claim approver." Ryan Aff. Ex. 10 at 169. Phillipe testified that she believed that DiGiovanni could return to work as a claims analyst as that position is described in the job description form and that she believed that the job description accurately reflected DiGiovanni's duties. Cronin Aff. at 17-19. Phillipe further testified that DiGiovanni's duties were "similar or the same" as her duties [*18] as a claims analyst but when asked how often she entered data into a computer, she responded, "not much, really." Cronin Aff. at 34-35. These statements do not indicate that Guardian applied an erroneous standard, but rather reflect the judgment that DiGiovanni was able to perform full time work for which she was suited, *including* the work she had previously performed.

There is no genuine dispute that DiGiovanni can drive a car, perform basic household chores and has full use of her dominant, right hand, though the parties dispute the duration and intensity with which DiGiovanni can perform these tasks. However, the medical evidence in the record clearly supports Guardian's conclusion that DiGiovanni was not "totally disabled" as defined in the Policy. Contrary to DiGiovanni's argument, testimony of a vocational analyst is not necessary in light of the facts and opinions in the record.

Summary judgment should also be granted for the defendant on Counts IV and V, which seek relief under *29 U.S.C. § § 1132*(a)(3)(A), 1132(a)(3)(B), because DiGiovanni has an available, albeit unsuccessful, claim under *29 U.S.C. § 1132*(a)(1). "Federal [*19] courts have uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to Section a(1), there is an adequate remedy under the plan which bars a further remedy under Section a(3)." *Larocca v. Borden, Inc., 276 F.3d 22, 28 (1st Cir. 2002).*

Similarly, a claim for breach of fiduciary duty under ERISA is only available to "participants who are unable to avail themselves of other remedies." *Mauser v. Raytheon Co. Pension Plan for Salaried Employees, 239 F.3d 51, 58 (1st Cir. 2001)* (following the general principle from *Varity Corp. v. Howe, 516 U.S. 489, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996)* that courts "should avoid creating duplicative remedies for violations of ERISA's provisions"). Therefore summary judgment is also appropriate as to Count II, which alleges that Guardian breached its fiduciary duty under ERISA by wrongfully terminating DiGiovanni's right to long term disability benefits, is also granted.

B. COBRA claim under *29 U.S.C. § 1161*

DiGiovanni also alleges that Guardian failed to notify her timely of her statutory right to continuing health care coverage. Under COBRA, [*20] an employer must notify an insured of the opportunity for continuing health care coverage within fourteen days of a "qualifying event," which in this case is the "termination . . . of the covered employee's employment." *29 U.S.C. § 1163*(2); *29 U.S.C. § 1166*(c) ("For purposes [of notifying the beneficiary of rights under this section], any notification shall be made within 14 days" of a qualifying event.). The continuing coverage is available for a minimum of 18 months after the date of the qualifying event. See *29 U.S.C. § 1162*(2)(A)(i). DiGiovanni seeks the statutory remedy of $ 100.00 per day commencing September 1, 1997, for Guardian's failure to give her timely notice, see *29 U.S.C. § 1132*(c)(1), and her medical expenses for the period August 31, 1997 through April 20, 1998.

In a letter dated April 17, 1998, Guardian informed

Case 1:03-cv-12389-GAO    Document 28-38    Filed 02/08/2006    Page 7 of 8

Page 7

2002 U.S. Dist. LEXIS 12380, *; 28 Employee Benefits Cas. (BNA) 2126

DiGiovanni of her right to continued health insurance coverage under COBRA. Ryan Aff. Ex. B at 4. The letter stated that because her disability benefits ended on August 31, 1997, her "separation date [would] also be recorded as August 31, 1997," that [*21] she could continue her Guardian medical coverage for September through December at the stated monthly rates, and that "in order to be covered retroactively to the date of termination, [she] must pay the premium from September 1997 through April 1998." Id. The letter requested that DiGiovanni complete and return the enclosed COBRA form stating whether or not she elected or declined coverage. Id. The form attached to the letter calculated the amount DiGiovanni owed for retroactive premium payments to be approximately $ 3,300.00. Ryan Aff. Ex. B at 5. DiGiovanni declined the COBRA coverage.

According to Guardian, DiGiovanni's employment terminated on August 31, 1997. n4 Guardian had 14 days from this date, until September 14, 1997, to inform DiGiovanni of her rights under COBRA. See *29 U.S.C. § 1166*(c). The actual notice given in the letter dated April 17, 1998, came 215 days late.

> n4  Guardian argues that DiGiovanni's "qualifying event" occurred in March 1993 when DiGiovanni began to receive total disability benefits because the Policy provides that "termination of employment shall, for the purposes of this Policy, be deemed to occur when an Employee ceases to be actively engaged in work on a full-time basis with the Policyholder . . . ." Compl. Ex. A, Part I, § 4(B) at 4. Guardian claims that its obligation to provide 18 months of continuing coverage pursuant to COBRA expired in September 1994. However, the letter dated April 22, 1994, in which Guardian informed DiGiovanni that she was entitled to long term disability benefits also states that she will receive group medical and dental coverage as long as she receives long term disability benefits and "will no longer be required to make a contribution toward these coverages." Ryan Aff. Ex. 2 at 279. Guardian is bound to the termination date it announced to DiGiovanni in the April 17, 1998 letter.

[*22]

Guardian's failure to provide timely notice was prejudicial to DiGiovanni, an unemployed woman on a fixed income, because it presented her with the unreasonable option of paying a large lump sum for retroactive health care coverage. If DiGiovanni had received timely notice of the opportunity to continue her health care coverage on September 14, 1997, she might well have been able to budget the approximately $ 400 per month to continue the coverage. Instead, she was faced in April 1998 with the option of paying approximately $ 3,300 dollars for the same coverage. This "option" was not practical for a person in her situation.

Although DiGiovanni has not formally moved for summary judgment on this claim, the case comes to the Court as an appeal of a ERISA decision, and accordingly, the Court may resolve the merits of her claim on the available record. The statute permits a penalty of "up to $ 100 per day" for failure to provide timely notice. For a 215-day delay, the penalty is $ 21,500. While there is no evidence of bad faith on the part of Guardian, the length of the delay and the prejudice to DiGiovanni's practical ability to make a retroactive lump sum premium payment combine to [*23] justify an assessment in that amount. On the other hand, DiGiovanni is not entitled to an award of medical costs for the period in which she was not a Guardian employee and during which she did not pay the premium for the COBRA coverage.

C. Guardian's Counterclaim

The Policy provided that an insured's benefits, payable under either Plan A or Plan B "shall be reduced by the amount the Employee receives or is entitled to receive for the same period or any part thereof, from any of the following sources: Any periodic payments under Title II of the Social Security Act . . . ." Compl. Ex. A, Part III, § § 4(A), (A)(1) at 6; Part IV, § 5(A), (A)(2) at 9. In September 1993 and March 1994, Guardian reminded DiGiovanni that the Policy required her to apply for Social Security benefits and that Guardian would pay the benefits without reduction while her application for benefits was pending before the Social Security Administration. Ryan Aff. Ex. 15 at 288, 281. In September 1994, DiGiovanni submitted to Guardian a Social Security Notice of Reconsideration that denied reconsideration of her claim for benefits because she "experienced hand pain but . . . [did] not have any manipulative [*24] limitations." Ryan Aff. Ex. 2 at 262. DiGiovanni appealed the denial and in 1999 received an award from the Social Security Administration totaling $ 32,440.80 covering the period from September 1993 through July 1998. Ryan Aff. Ex. E at 2. Guardian's counterclaim seeks reimbursement by way of an offset of the Social Security benefits paid against the disability payments made under the Policy. n5

> n5  Since state law actions to enforce the

2002 U.S. Dist. LEXIS 12380, *; 28 Employee Benefits Cas. (BNA) 2126

contractual terms of an ERISA Plan are preempted by the federal statutory scheme, see *Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 53-56, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987),* the Court construes the counterclaim as a claim for equitable relief in the form of restitution pursuant to *29 U.S.C. § 1132*(a)(3). See *Metro. Life Ins. Co. v. Socia, 16 F. Supp. 2d 66, 72 (D. Mass. 1998).*

DiGiovanni does not dispute that she received disability benefits from Guardian from September 1993 through July 1997, and she does not dispute [*25] that she later was granted the Social Security benefits for the same time period. Guardian's counterclaim seeks $ 20,065, a figure obtained by (a) rounding the monthly Social Security disability benefit downward to the nearest dollar, (b) excluding the cost-of-living increases, and (c) allowing the $ 4000 attorney fee awarded by Social Security. See Def.'s Countercl. P 9(a); 9(b). DiGiovanni

has submitted no documentation to show that this calculation is inaccurate. Accordingly, Guardian is entitled to summary judgment on its counterclaim in the amount of $ 20,065.

**IV. Conclusion**

Based on the foregoing reasons, judgment shall enter in the defendant's favor under Counts I, II, IV, and V of the Complaint, and under the counterclaim in the sum of $ 20,065. Judgment shall enter for DiGiovanni under Count III in the amount of $ 21,500. No attorneys' fees are awarded to either party.

IT IS SO ORDERED.

June 28, 2002
DATE

GEORGE A. O'TOOLE, JR.

DISTRICT JUDGE